[Crim. No. 43117. Second Dist., Div. One. Apr. 25, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
FREDERICK GEORGE ROEHLER II, Defendant and Appellant.

354

## Counsel

Wendy Cole Lascher, under appointment by the Court of Appeal, Lascher & Lascher and Edward L. Lascher for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Edward T. Fogel, Jr., and Mark Alan Hart, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

HANSON (Thaxton), J.—Defendant Frederick George Roehler II appeals from the judgment convicting him of the first degree murders of his wife, Verna Roehler and his stepson, Douglas Johnson. Defendant was sentenced to life in state prison without possibility of parole. We affirm the judgment.

### Procedural History

By information, defendant was charged in count I with the murder of Verna, in violation of Penal Code section 187. In count II, defendant was charged with the murder of Douglas, in violation of Penal Code section 187. Three special circumstances were alleged: that defendant had committed more than one offense of murder; that the murder of Verna had been

intentional and carried out for financial gain; and that the murder of Douglas was also intentional and carried out for financial gain.

Defendant entered a plea of not guilty to both counts and denied the allegations of special circumstances. His motions to suppress evidence were denied, as were his applications for release on bail. Various discovery motions by defendant were granted. Defendant's Penal Code section 995 motion was denied.

Prior to trial, the trial court ruled that the prosecution could not present evidence concerning defendant's relationship with his first wife, Jean Roehler, nor could the prosecution acquaint the jury with the nature and circumstances of Jean Roehler's death and any insurance claim made by defendant with respect to Jean's demise. Defendant's motion concerning this matter, pursuant to Evidence Code section 1101, subdivision (a), was granted because the trial court specifically found that the prejudicial effect of the evidence would outweigh its probative value, as provided in Evidence Code section 352.

Trial was by jury. A portion of the prosecution's case-in-chief consisted of testimony regarding the results of various physical experiments, and the trial court made a series of rulings admitting some testimony and excluding other testimony; these rulings shall be discussed herein as they become relevant to the issues raised on appeal.

Defendant's motion to dismiss the murder counts, made pursuant to Penal Code section 1118.1, was denied. His motion for judgment of acquittal on the special circumstance that the murder of Verna was intentional and committed for financial gain was denied. However, the trial court did grant a similar defense motion with respect to Douglas Johnson, and dismissed the third special circumstance that had been alleged.

The prosecution's requests during rebuttal for the showing of a video tape of experiments at Bird Rock, the scene of the crimes, and that the jury be permitted to travel to that location, were denied. Defendant's renewed motion to dismiss was denied.

The jury found defendant guilty of murder as charged in counts I and II, and found each murder to be of the first degree. The jury further found that the two remaining special circumstances allegations were true.

During the penalty phase of trial, the trial court ruled that the prosecution could present evidence of the drowning of defendant's first wife, Jean Roehler, as a circumstance in aggravation; defendant's motion for a new jury

was denied. There were further rulings by the trial court limiting the nature of evidence admissible concerning Jean Roehler's death. After the prosecution had presented this evidence in its case-in-chief, the trial court granted defendant's motion to exclude the evidence, specifically ruling that there was no evidence that Jean Roehler had died by criminal means or at the hands of another person. Defendant's motion seeking a life sentence was denied. His motion for a mistrial was denied.

The jury determined defendant's punishment to be life imprisonment without possibility of parole. Defendant's motion for new trial was denied. The defendant was found ineligible for probation; the trial court further declared that if defendant were eligible for probation, probation would nevertheless be denied, pursuant to rule 414, California Rules of Court.

Defendant was sentenced to state prison for the term of life without possibility of parole on counts I and II. Sentence on the two counts was ordered to be served concurrently. Sentence on count II was stayed pending appeal, with the stay to become permanent when the sentence on count I has been completed.

## STANDARD OF REVIEW

■ As with other trial court judgments, a jury verdict in a criminal case is presumed to be correct on appeal from the judgment of conviction. In the matter before us, the jury was required to resolve very substantial conflicts in the evidence presented. It is well established that an appellate court may not substitute its resolution for that already chosen by the jury, but must uphold such factual determinations—and the reasonable inferences drawn therefrom—if supported by substantial evidence. Inquiry into the substantiality of the evidence, however, is a principal appellate function as is inquiry into other claims of error.

In *People* v. *Johnson* (1980) 26 Cal.3d 557, 575-578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255], the California Supreme Court analyzed prior California decisions concerning the appropriate standard of review employed by appellate courts when, as here, the sufficiency of the evidence supporting a judgment of conviction was in issue on appeal. The court declared that our courts had generally been consistent in applying the rule set forth by the United States Supreme Court in *Jackson* v. *Virginia* (1979) 443 U.S. 307, 318-319 [61 L.Ed.2d 560, 573, 99 S.Ct. 2781], that " 'the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction [is] to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.' " (*Id.*, at p. 576.)

*Johnson* reaffirmed that "the [appellate] court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*Id.*, at p. 578.)

## EVIDENCE ADDUCED BELOW

Verna Roehler and Douglas Johnson drowned in the ocean near Santa Cruz Island off the Santa Barbara coast, at a location known as Bird Rock, on January 2, 1981. The prosecution charged that these were not accidental drowning deaths, but had been staged by defendant to appear as accidental when in reality they were premeditated murders committed by defendant for financial gain, i.e., for the purpose of collecting the very substantial insurance proceeds payable upon the accidental death of Verna. Defendant insisted that the drownings had occurred accidentally when the dory in which he, Verna, Douglas and the family dog were riding overturned. As defendant was the only witness and sole survivor of the incident, his testimony concerning the events that culminated in the deaths of his wife and stepson was a central issue in this long trial; it provided much of the context in which the evidence on both sides was presented. As we summarize that evidence, we are mindful of the standard of appellate review to which reference has already been made.

Defendant married Verna Jo Johnson in 1977. Each was approximately 35 years of age, and owned property in Malibu. They took up residence there with their four young children of previous marriages: Kimberly Johnson, Heidi Roehler, Douglas Johnson and Kirsten Roehler. (At the time of trial, Kimberly was 11, Heidi was 10, and Kirsten 8. Douglas was eight years old at the time of his death).

The family engaged in much outdoor activity and sports, and enjoyed a high standard of living. In fact, there was considerable evidence at trial that the Roehlers were living beyond their means, that far more money was being expended than was coming in. Defendant, an engineer, was not employed during a portion of the period from 1977 to 1981, due to an injury. Verna worked in a minor capacity, part time, for the Santa Monica School District, with annual earnings of less than $3,000.

A fire had damaged some rental units in Malibu owned by Verna, and defendant and Verna obtained a loan for repairs from the Small Business Administration, using the marital residence as collateral; some of these funds were used to defray family living expenses. Income was also realized from the rental of heavy equipment and labor to other property owners who

had sustained damage in the same fire. There was evidence, however, of financial strain. Verna had mentioned this to her good friend, Patti Leitelt, who also testified that on occasion Verna's credit cards were rejected by merchants when she wished to make a purchase.

Prosecution witness Thomas Sever, a certified public accountant in Santa Barbara, testified at trial that after analysis of the couple's financial records it was clear that the Roehlers had made inroads into their capital, that their liquid assets were diminishing, and that the negative cash flow in the years 1979 and 1980 was, respectively, $51,237.04 and $51,891.73. In April 1980, however, the Roehlers acquired the Perseverance, a 50-foot fiberglass sailboat, and were preparing to take the boat and the entire family on a long cruise.

In February 1980, defendant talked to his attorney, William Fairfield, at a social gathering about needing to do some estate planning. Attorney Fairfield subsequently advised defendant and Verna on this subject; a will and a trust were prepared which were executed at the end of October 1980.

In August 1980, defendant wrote a letter to Travelers Insurance Company inquiring about insurance to pay off the mortgage on a home in the event of a husband or wife's death. Thereafter, Travelers Insurance Company salesman Raymond Wylie contacted defendant and was told by defendant that defendant and Verna owned real and personal property of over $1 million. Based on figures supplied to him by defendant, Wylie determined that regardless of whether defendant or Verna died first, very substantial sums (ranging from $491,137 to $644,635) would be needed by the survivor to "clear" the estate of the decedent. Both Wylie and his manager, Tom Costanzo, reviewed this information with defendant.

In December 1980, Travelers Insurance Company issued life insurance policies on defendant, Verna, and the four children. The policy on defendant was for $400,000, level term insurance until aged 70. Verna was the beneficiary. The contingent beneficiary was the Johnson-Roehler trust, established at the same time the will was executed. The policy on Verna was also for $400,000, with defendant the beneficiary. Both policies included an accidental death benefit in the amount of $300,000, the maximum amount of coverage available with Travelers. Thus, assuming that Verna died before defendant, by accidental means, the proceeds payable according to the terms of that policy would have been $700,000. Also purchased were whole life insurance policies for each child, including Douglas, each policy having a face value of $60,000. Each of these policies also had a double indemnity clause, providing for payment of twice face value if the child insured died accidentally. While defendant was not the named beneficiary of the policy

on Douglas, he owned the policy, could designate the beneficiary, and could effectively control use of the proceeds through his control of the trust.

The annual premium for the six policies was $3,698.18. Five of the policies were delivered to defendant about December 4, 1980; the policy on Verna, held up temporarily, was not delivered until December 16, 1980, and there was testimony that defendant was agitated by the delay. Toward the end of December 1980, defendant paid to Travelers the sum of $97.63, as the initial payment of premiums for the coverage obtained.

Attorney Douglas Schmidt of Santa Barbara testified for the prosecution concerning the Roehler estate planning, the trust and the purchase of the life insurance. A graduate of Harvard Law School and an experienced estate planner, Schmidt had been provided with the documents formalizing these arrangements and with the analysis prepared by Thomas Sever of the Roehler cash flow problems, and information about the Roehler property interests. In Schmidt's opinion, Verna Roehler needed far less than $400,000 to "clear" her estate, probably between $50,000 and $100,000. In 18 years of estate planning, Attorney Schmidt testified that he had never had a client who purchased whole life insurance on the life of an 8-year-old, a child without an estate of his own, in the amount of $60,000. Nor could he identify any need for the purchase of the $300,000 accidental death benefit. In Schmidt's experience, a family's life insurance purchase is normally made pursuant to expert recommendation; some limitation is usually placed on family spending in this area also, by the cost of what a family can afford.

In any event, the six policies were in effect on January 2, 1981.

On the morning of January 2, 1981, defendant, Verna, the four children, defendant's father and mother, Fritz and Charlotte Roehler, and defendant's brother, Scott, and sister-in-law, Ginny, set sail from Ventura Harbor about 8 a.m. for a day on the water. Defendant's relatives had been visiting from Indiana for the holidays, and were being shown the Perseverance for the first time.

The vessel reached the anchorage known as Little Scorpion, near Santa Cruz Island off the California coast in Santa Barbara County about noon. Several other sailing vessels were at the anchorage. After lunch, the elder Roehlers decided to take a nap. Scott and Ginny Roehler, accompanied by Heidi and Kimberly, took a dinghy in search of land, because Ginny had been very seasick on the trip over to the anchorage. Kirsten, the youngest child, stayed on the Perseverance.

Considerable testimony was offered by some preliminary prosecution witnesses about the swimming capabilities of defendant, Verna and Douglas.

Defendant had unusual strength in the water; he was not only a strong, experienced swimmer but had in fact been trained, while working as an engineer for the United States Navy, to be a deep sea diver. A reasonable inference from this testimony was that the training had been available to those individuals demonstrating not only strong physical skills but the psychological capacity to perform under stress and reject fear in deep water. Defendant had also been trained in various life-saving techniques. Both Verna and Douglas were in reasonably good health, according to the family physician, were adequate swimmers, had swum frequently in the ocean, and were capable of at least staying afloat in an emergency.

Defendant, Verna, Douglas and the family dog got into the dory, a small craft propelled by oars which was normally towed behind the Perseverance. They commenced rowing toward a location known as Bird Rock, about 100 yards away. Bird Rock is a jagged piece of rock rising out of the ocean and inhabited by many sea birds. Verna wanted defendant to take a picture of Douglas holding the dog, with sea birds and the Perseverance in the far background. Douglas was wearing a life jacket; defendant was also, and had a Nikonos 35 millimeter underwater camera strapped around his neck.

Defendant testified that there was high cloudiness, and some sun. While the testimony of others about weather conditions at Little Scorpion that afternoon varied, the wind and sea were relatively calm, although some white caps appeared later in the day. The water was cold.

Defendant testified that he was sitting in the middle of the dory, Verna was in the bow holding the dog, and Douglas was in the stern. It took 15 or 20 minutes for him to row the dory to a point about 30 or 40 feet off Bird Rock. The boat was positioned so that Douglas could be photographed with the dog, sea birds and the Perseverance. Defendant testified that the dog got excited by the birds and started to jump out of the boat; defendant grabbed for the animal, as did Douglas. Douglas "overshot," according to defendant, and was falling out of the boat when defendant felt Verna's weight on his back. The boat turned over, trapping defendant underneath. It took about 30 seconds to a minute for defendant to free himself, because he had become entangled in some manner.

When he reached the surface, he first saw no one, then observed Verna with her eyes open, sort of "resting" on one portion of the overturned boat, and he saw Douglas some feet beyond her. He went to Douglas first, and tried to remove vomit which was in the boy's mouth, and give him air. The dog had somehow gotten on defendant's head. Defendant tried to give Verna air, also, but defendant testified that neither Verna nor Douglas said any-

thing or appeared to respond to anything. Defendant denied any responsibility for or understanding of these circumstances.

Defendant, with Verna under one arm and Douglas under the other, and the dog on his head, swam to Bird Rock. There he was able to deposit the dog, but could not get Verna or Douglas to safety because of the steep configuration of the rock. He kept them afloat, however, while he tried to hail a boat for assistance. Defendant estimated that he had tried to get the attention of others for between fifteen minutes and one-half hour, before the crew of three aboard the sailing vessel, the Sound of Music, spotted the overturned dory and rushed to the scene. Defendant swam toward the vessel away from Bird Rock, still holding Verna and Douglas under each arm. Verna and Douglas were brought on board; defendant was winched on board, because he did not have enough strength left in his legs to climb a ladder to get onto the deck of the ship.

There was testimony from all three crew members aboard the Sound of Music, the original rescuers, and all subsequent participants in the resuscitation efforts, that at no time were Verna or Douglas roughly handled or banged around during or after the rescue. It was the observation of the original rescuers that Verna and Douglas were comatose when they were brought to the Sound of Music, and that they never responded to anything around them. Both were immediately given CPR, to no avail. When defendant had approached the Sound of Music, he had requested that the Coast Guard be called, had apparently said something to Verna and Douglas about how they were going to make it now. He said nothing while laying on the deck. He seemed to be very cold, but otherwise was not in need of any kind of emergency medical attention.

The Coast Guard arrived about 4 p.m., followed by a navy helicopter. The experienced paramedics who arrived could do nothing to revive Verna and Douglas; there were no signs of life. The bodies were transported to Ventura. Defendant testified that he learned of their deaths from a Roman Catholic priest at St. John's Hospital in Oxnard.

The bodies of Verna and Douglas were taken to the Ventura County Coroner's Office for autopsies. On January 3, 1981, Dr. Craig Duncan, the Ventura County Coroner, performed the autopsies and concluded that each death had occurred as the result of accidental drowning. The bodies were then released to a private mortician in the Westwood area of Los Angeles.

On that same day, however, the Santa Barbara Sheriff-Coroner's Department (constituting a single governmental unit in Santa Barbara County) received a telephone call from a woman named Hinman, unknown to them,

who suggested that defendant's first wife Jean had died under suspicious circumstances and that the deaths of Verna and Douglas should be carefully scrutinized for that reason. Defendant was interviewed by Santa Barbara law enforcement officials on January 7, 1981, but in spite of giving defendant his *Miranda* rights, those interviewers did not consider defendant a suspect at that time.

On January 8, 1981, the sheriff-coroner of Santa Barbara County obtained a warrant for the bodies of Verna and Douglas. The mortuary had been contacted and had agreed to preserve the bodies. A deputy proceeded to the mortuary and took possession of the bodies, and transported them to Santa Barbara. There, on January 9, 1981, the Santa Barbara Medical Examiner, Dr. Dewitt Hunter, performed a second autopsy on each body.

Dr. Hunter testified at length for the prosecution. He has had extensive education at Johns Hopkins and Penn, in pathology; is board certified in anatomical pathology and in clinical pathology; has taught at various institutions throughout the country, conducted research, has written in his fields of interest; he has also devised laboratory systems widely used in this country. Also, Dr. Hunter has had extensive experience in determining the cause of death, and has conducted autopsies in hundreds of cases of violent deaths; he also has extensive forensic experience.

Dr. Hunter spent five or six hours conducting the autopsies of Verna and Douglas. He discovered, when examining the area inside the skull of Verna known as the petrous ridge, hemorrhaging in the mastoid sinuses. He also found bruises on Verna's neck.

At trial, some time was spent by Dr. Hunter explaining how pathologists tell whether a wound or a bruise stems from premortem activity, perimortem activity (at or around the time of death) and postmortem activity. Simply put, premortem bruises or injuries will not "blanch," i.e., lose their color, and they become even more vivid after some time has elapsed after death.

Verna's neck bruises appeared to Dr. Hunter to be premortem. In addition, there were areas of Verna's skull showing premortem hemorrhaging; in Dr. Hunter's opinion, red blood cells in those areas had been forced into the surrounding tissues prior to her death. Dr. Hunter was of the opinion that the hemorrhages had been caused by the use of considerable force. There was also bleeding in brain tissue, the result of injury occurring very close to death.

Dr. Hunter had examined the dory which had capsized and had been to Bird Rock to study the configuration of the rocks. He testified that he did

not believe the injuries to Verna's skull had been caused by either the dory or jagged rocks. He noted that there were none of the skin lacerations of the type one would expect if the injuries had been caused by contact with sharp objects. He also testified that it was unlikely that the injuries had occurred during the previous autopsy because there were no signs of rough autopsy treatment in other areas of Verna's body. Dr. Hunter was of the opinion that blunt force had been applied to Verna's head just prior to her death by drowning. The "blunt force" applied would be that equal to a fall from a height of at least five feet and striking wood, but had, in Dr. Hunter's opinion, probably been inflicted by some kind of a small instrument.

Dr. Hunter then turned to the autopsy of Douglas Johnson. In his view, Douglas had sustained a number of premortem injuries. Two of principal importance were located on the skull of Douglas. The muscles in the back of Douglas' neck showed areas of hemorrhaging directly below the base of the skull, extending inward to a depth of at least one inch. The other area of hemorrhaging was in the scalp area, where a considerable injury had been sustained. The areas observed would not "blanch"; Dr. Hunter was convinced these injuries were premortem. Dr. Hunter thought the wounds on the scalp of the boy had also been caused by a small instrument of some kind.

Dr. Hunter repeated his conclusion that neither the dory nor the rocks at Bird Rock, or postmortem handling either by rescuers or the individuals conducting the first autopsy, would account for the boy's head injuries. In his opinion, Douglas, like his mother, had not died accidentally, but had drowned *after* the application of blunt force to his head with a small instrument.

Dr. Charles S. Petty, Chief Medical Examiner in Dallas County, Texas, also testified and concurred with Dr. Hunter as to the cause of death in each case. He specifically noted evidence of subarachnoid bleeding in the covering of Douglas' brain. Drowning does not cause such hemorrhaging, but injuries to the head at the time of the drowning would. Dr. Petty, too, rejected the idea that either the rocks or contact with the dory itself could have caused the victims' injuries. He thought it more likely that in the case of Douglas, the child's head had been smashed against another surface, just prior to death.

The prosecution then presented evidence concerning the dory which, according to defendant, had overturned on the day in question, causing Verna and Douglas to drown. The prosecution had enlisted the aid of Dr. Scott Hickman, a professor of mechanical and environmental engineering at the University of California at Santa Barbara, whose speciality was fluid me-

chanics. Hickman, besides his professional accomplishments, had much experience personally in the water as a surfer, a swimmer, a scuba diver, and a sailor. He supervised the testing of the dory.

The prosecution had obtained possession of the dory in January 1981, and conducted testing of the craft in July 1981 at Bird Rock. The testing was video taped. Three individuals participated in the tests, all chosen because of their similarity in size and weight to the three participants in the fatal events of January 2, 1981, at that location. The three were a Santa Barbara detective, a female employee of the sheriff's department, and a young boy. All were dressed as defendant, Verna, and Douglas had been dressed at the time of the crimes.

The seas were rougher in July 1981 than they had been in January. Nevertheless, in the first three tests wherein the test participants attempted to cause the dory to overturn, it would not do so. In spite of shifting the weight of all three persons as depicted by defendant, the dory would take on water but right itself. In tests four, five and six, the participants were able to get the dory to turn over, very slowly, by utilizing not only the shift in position but the considerable wind and choppy seas. The seventh test did not result in a turnover, but the eighth one did, again, very, very slowly. Dr. Hickman computed that the fastest turnover rate for the dory was 3.19 feet per second. He came to the conclusion that there is no way to overturn this particular dory by accidental means, except in a breaking wave—of which there were none at Bird Rock. He further concluded that concentrated and purposeful effort by someone in the dory would have been required to cause it to turn over on the fatal day, and further, the boat capsized so slowly that persons in the boat had time to swim free of it. There was subsequent testimony from an experienced naval architect that dories are constructed with the primary purpose of being very difficult to capsize.

Dr. Hickman also tested the velocity of a boy of Douglas' size and weight rising in the water from immersion, the popping to the surface phenomenon. He determined that to be 3.36 feet per second, and the combined closing velocity between the dory turning over and a boy rising to be 6.55 feet per second. As will be seen, these figures were used in some of the later experimental testing that was done.

Dr. Carley Ward testified for the prosecution. She is an engineer. Dr. Ward commenced her career as a specialist in dynamics, and supervised groups of engineers who worked on various governmental space projects. She came to UCLA and took courses in medicine, earning a Ph.D, and commenced a specialty in biomechanics, the application of engineering principles to the human body or to biology. She has also done considerable

consulting for private industry, some of it directed toward establishing safety standards to prevent head injuries. She has recent experience in discovering, through research and testing, facts about head injuries.

The prosecution was attempting to determine if Douglas' head injuries could be attributed to the fact that Douglas was hit by the dory as he arose from the water. Dr. Ward reviewed Dr. Hickman's work in this regard and calculated a closing velocity (just before the boat and boy would meet) of 6.7 feet per second.

A test was performed at Minicars (the former name of a company specializing in engineering technology) to determine the maximum force that would be applied to the head of a child like Douglas Johnson and the acceleration he would experience, if the dory capsized and the child was hit by the boat while rising in the water from immersion. The child's part was played in this instance by a dummy, fashioned to be as similar as possible to Douglas. Dr. Ward, using the Roehler dory and the dummy, conducted experiments to determine the force which would be applied so that she could draw some conclusions about the force exerted on Douglas' head prior to his death. What emerged from the testing at Minicars was that the maximum force generated by the dory would have resulted in from 210 to 240 pounds of pressure on the skull of the boy, a relatively small amount; a fall by a toddler down several steps would generate far more force than that.

Two medical doctors testified. Dr. Burton Kolp, an expert practitioner in emergency medicine who saw head injuries on a daily basis, offered his opinion that the injuries could not have been occasioned by a collision between the boy's head and the boat. Dr. Randall William Smith, a neurosurgeon, board-certified, testified that he was particularly familiar with subarachnoid bleeding, which he too identified as having occurred in the case of Douglas. Such bleeding is the presence of free blood inside the head that is confined to the space just outside the brain but under the lining that surrounds the brain. Dr. Smith testified that he did not believe that the boy's injuries could have been caused by his head hitting the dory as the boy was rising in the water. The conclusion drawn from the Hickman-Ward experiments was that the force that would have been generated by the collision was not nearly sufficient to cause Douglas' head injuries.

On rebuttal, Dr. Ronald Kornblum, formerly the medical examiner for Ventura County and employed as chief of forensic medicine in Los Angeles County, testified it was also his opinion that the injuries to Verna and Douglas were premortem, and that the hemorrhaging evidence on both skulls indicated that the victims' hearts were pumping considerably at the time of

the wounds. Dr. Kornblum thought the blow to Verna's neck and head had stunned her.

Also presented was the testimony of Joseph B. Davis, M.D., the Chief Medical Examiner of Dade County, Florida. Dr. Davis agreed with the conclusions of Drs. Hunter and Petty.

California Department of Justice criminalist Duane Mauzey had previously testified that extensive investigation and repeated testing of various objects aboard all the vessels involved in this matter had not resulted in duplicating the "patterns" of injury he had discerned on Douglas' skull, except in one place: the dory, where such patterns could be produced by smashing the head of a test dummy against the flat part of the gunnel and the vertical support.

As indicated, the jury convicted defendant of the two murders, each in the first degree.

ISSUES

On appeal, defendant contends (1) that the seizure and autopsies of the bodies of Verna and Douglas by the Santa Barbara coroner-sheriff violated the rights guaranteed him by the Fourth Amendment, United States Constitution; (2) that the concealment of the second autopsies and failure to take reasonable steps to preserve the bodies denied him due process of law; (3) that the trial court erred in permitting testimony before the jury concerning a series of physical experiments, which were irrelevant to the material issues in the case and were not conducted on a sound, scientific basis; (4) that the jury was misinstructed in a significant manner, and (5) that the evidence was insufficient to establish that *any* crime had been committed.

DISCUSSION

I.

Defendant first contends that the Fourth Amendment, United States Constitution, was violated when Santa Barbara law enforcement authorities removed the bodies of Verna and Douglas from a private mortician in Los Angeles County after the bodies had been autopsied and released by the Ventura County coroner. Defendant argues that neither probable cause nor exigent circumstances justified the removal; that a sheriff-coroner is subject to the Fourth Amendment; that defendant had a reasonable expectation of privacy concerning the bodies; and that evidence obtained as a result of the

seizure, i.e., the results of the second autopsies, should have been suppressed.

The Attorney General argues that the statutory provisions empowering coroners to investigate and establish the cause of death constitute sufficient basis for the actions of the Santa Barbara coroner in this case. The Attorney General contends that "it is well-settled that a coroner need not obtain a search warrant in order to secure bodies for investigation." No authority is cited for this statement, nor were we assisted by the People with pertinent observations about any constitutional ramifications of the search and seizure made.

What is presented is a novel constitutional law issue concerning the parameters of permissible governmental intrusion into the lives of citizens when a death has occurred.

In California, the powers and responsibilities of coroners are set forth in Government Code section 27491, which provides: "It shall be the duty of the coroner to inquire into and determine the circumstances, manner, and cause of all violent, sudden or unusual deaths; unattended deaths; deaths wherein the deceased has not been attended by a physician in the 20 days before death; deaths related to or following known or suspected self-induced or criminal abortion; known or suspected homicide, suicide, or accidental poisoning; deaths known or suspected as resulting in whole or in part from or related to accident or injury either old or recent; deaths due to drowning, fire, hanging, gunshot, stabbing, cutting, exposure, starvation, acute alcoholism, drug addiction, strangulation, aspiration, or where the suspected cause of death is sudden infant death syndrome; death in whole or in part occasioned by criminal means; deaths associated with a known or alleged rape or crime against nature; deaths in prison or while under sentence; deaths known or suspected as due to contagious disease and constituting a public hazard; deaths from occupational diseases or occupational hazards; deaths of patients in state mental hospitals serving the mentally disabled and operated by the State Department of Mental Health; deaths of patients in state hospitals serving the developmentally disabled and operated by the State Department of Developmental Services; deaths under such circumstances as to afford a reasonable ground to suspect that the death was caused by the criminal act of another, or any deaths reported by physicians or other persons having knowledge of death for inquiry by coroner. Inquiry in this section does not include those investigative functions usually performed by other law enforcement agencies.

"In any case in which the coroner conducts an inquiry pursuant to this section, the coroner or a deputy shall personally sign the certificate of death.

If the death occurred in a state hospital, the coroner shall forward a copy of his report to the state agency responsible for the state hospital.

"The coroner shall have discretion to determine the extent of inquiry to be made into any death occurring under natural circumstances and falling within the provisions of this section, and if inquiry determines that the physician of record has sufficient knowledge to reasonably state the cause of a death occurring under natural circumstances, the coroner may authorize that physician to sign the certificate of death."

Certain subsequent sections further delineate the powers and responsibilities of the coroners of our counties.[1] One primary responsibility is that of signing the death certificate of the deceased person.[2]

---

[1]Government Code section 27491.2 provides that "The coroner or his appointed deputy, on being informed of a death and finding it to fall into the classification of deaths requiring his inquiry, may immediately proceed to where the body lies, examine the body, make identification, make inquiry into the circumstances, manner, and means of death, and, as circumstances warrant, either order its removal for further investigation or disposition, or release the body to the next of kin. For purposes of inquiry, the body of one who is known to be dead under any of the circumstances enumerated in Section 27491 shall not be disturbed or moved from the position or place of death without permission of the coroner or his appointed deputy."

Government Code section 27491.4 provides, in pertinent part, that "For purposes of inquiry . . . the coroner may, in his or her discretion, take possession of the body, which shall include the authority to exhume such body, order it removed to a convenient place, and make or cause to be made a post mortem examination or autopsy thereon, and make or cause to be made an analysis of the stomach, stomach contents, blood, organs, fluids, or tissues of the body. The detailed medical findings resulting from an inspection of the body or autopsy by an examining physician shall be either reduced to writing or permanently preserved on recording discs or other similar recording media, shall include all positive and negative findings pertinent to establishing the cause of death in accordance with medicolegal practice and this, along with the written opinions and conclusion of the examining physician, shall be included in the coroner's record of the death. The coroner shall have the right to retain only such tissues of the body removed at the time of the autopsy as may, in his or her opinion, be necessary or advisable to the inquiry into the case, or for the verification of his findings. No person may be present during the performance of a coroner's autopsy without the express consent of the coroner. . . . Nothing in this section shall be deemed to prohibit the discretion of the coroner to conduct autopsies upon any victim of sudden, unexpected, or unexplained death or any death known or suspected of resulting from an accident, suicide, or apparent criminal means, or other death, as described in Section 27491."

[2]Government Code section 27491.5 provides, with respect to execution of the death certificate, that "The cause of death appearing on a certificate of death signed by the coroner shall be in conformity with facts ascertained from inquiry, autopsy and other scientific findings. In case of death without medical attendance and without violence, casualty, criminal or undue means, the coroner may, without holding an inquest or autopsy, make the certificate of death from statements of relatives, persons last in attendance, or persons present at the time of death, after due medical consultation and opinion has been given by one qualified and licensed to practice medicine and so recorded in the records of the death, providing such information affords clear grounds to establish the correct medical cause of death within accepted medical practice and within the requirements for accuracy prescribed by the Division of Vital Statistics of the State Department of Health Services. The coroner shall not finally exclude crime, suicide, or accident as a cause of death because of lack of evidence."

Other pertinent provisions attendant on the death of a human being in California are contained in the Health and Safety Code. Section 10200 et seq. specifies the necessity of registering deaths; of completing death certificates in thorough and timely fashion prior to disposition of the remains (Health & Saf. Code, §§ 10204, 10375); and finally, with respect to coroners, Health and Safety Code section 7102 provides, in pertinent part, that "[I]n any case where a coroner is required by law to investigate the cause of death, the coroner is entitled to the custody of the remains of the person whose death is the subject of investigation until the conclusion of the autopsy or medical investigation by the coroner. Any person in whose possession such remains are found, shall, upon demand by the coroner, surrender such remains to him."

As the foregoing legislative enactments demonstrate, there has long been widespread recognition and acceptance of the importance of developing accurate and adequate information about the death of each and every human being, whenever possible. Reasons range from beliefs about the fundamental dignity of man to such practical concerns as control of disease, the keeping of statistics, and of course, the detection of negligent or intentional wrongdoing. It can be said that the safety of all members of society depends upon orderly and open procedures relative to death.

The government, as representative of its citizens, has the primary burden in this area. In California, the coroner of each county is the governmental agent empowered and entrusted with the responsibility of determining the cause of death, in keeping with the guidelines of Government Code section 27491.

Due to the fact that the case before us involved three counties and two coroners, defendant's counsel express concern that a rule will be formulated or approved which will encourage coroners, without limitation, to range the state in search of bodies to autopsy, whether already autopsied elsewhere or not. We doubt if such activity is likely to result from our interpretation of the legislation concerning coroners. While it is true that coroners are peace officers (as defined in Pen. Code, § 830.31, subd. (f)), we take the view that a coroner's discharge of his statutory duties is limited to instances where death has occurred *within his county*. A 1956 opinion of the Attorney General expresses that view, and we adopt it. The Attorney General's summary of its conclusions was that: "1. The coroner has no authority to investigate the cause of death of a person who was injured in his county but who dies outside the county. 2. The coroner must investigate every death occurring by violence, etc. in the county. Presence of the body is not requisite to his jurisdiction. 3. The coroner is to sign the death certificate where the death occurs in the county even though the body has been removed. 4.

The coroner has no official status beyond the limits of his county and no authority to call or question witnesses. He is not, however, forbidden to travel beyond the county and may base his report upon information obtained outside of the county." (27 Ops.Cal.Atty.Gen. 75 (1956).) We note that the California Supreme Court has addressed the issue of "county" jurisdiction in *People* v. *Fleming* (1981) 29 Cal.3d 698 [175 Cal.Rptr. 604, 631 P.2d 38], wherein the majority held that a magistrate may issue a search warrant directed toward premises outside his county if the search relates to criminal activity *within* his county.

If the Legislature feels the need to address the issue of serial autopsies, we are certain that they will do so. However, applying a reasonable interpretation of legislative provisions to the facts of the case at bench, we note that no question has been raised concerning the place of the deaths of Verna and Douglas: Santa Barbara County. The deaths were reportedly due to drowning, one of the categories specified in Government Code section 27491 compelling investigation and autopsy. The Santa Barbara sheriff-coroner had the responsibility not only to investigate and autopsy these bodies, but to sign the death certificates. ■ There was, therefore, no violation of any California statute relative to coroners resulting from the action of the Santa Barbara sheriff-coroner in proceeding to the private mortuary in Los Angeles County to retrieve the bodies of Verna and Douglas in order to perform the statutory duties imposed by state law on the Santa Barbara sheriff-coroner. On the contrary, state law required the taking of such action.

The Fourth Amendment to the United States Constitution provides that "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." The California Constitution contains a similar guarantee, in article 1, section 13.

In the case at bench, the Attorney General argues that there are no property rights in dead bodies, and thus presumably a seizure and search of them would not fall within the constitutional provisions just described. It is true that dead bodies are not regarded as "property" in the traditional sense of the word, connoting legally protected rights of ownership. Neither are they ephemeral, however. Lengthy analysis, both ecclesiastical and legal, has produced the term "quasi-property" (14 Cal.Jur.2d 49). Under California law, there are statutory provisions giving both the right to control disposition of the remains and financial responsibility for burial to surviving kin (Health & Saf. Code, § 7100). It has also been recognized that a cause of

action for emotional distress may arise on behalf of a living person as a consequence of asserted mistreatment of the body of a decedent. (*Allen* v. *Jones* (1980) 104 Cal.App.3d 207, 214 [163 Cal.Rptr. 445]; *Draper Mortuary* v. *Superior Court* (1982) 135 Cal.App.3d 533, 538 [185 Cal.Rptr. 396].)

■ We conclude that there is a reasonable expectation of privacy in the next of kin with respect to dead persons, and it could appropriately be asserted by the defendant.

In *Cleaver* v. *Superior Court* (1979) 24 Cal.3d 297, 302 [155 Cal.Rptr. 559, 594 P.2d 984], the California Supreme Court declared, with respect to the guarantees against unreasonable searches and seizures, that "a search within the meaning of these constitutional provisions occurs whenever a person's reasonable expectation of privacy is violated by governmental intrusion. [Citation.] It is further settled that, in the absence of one of a number of carefully circumscribed exceptions, such a search is per se unreasonable if it is not conducted pursuant to a valid search warrant. [Citations.]" These exceptions have been described by the United States Supreme Court as "'jealously and carefully drawn,' and there must be 'a showing by those who seek exemption . . . that the exigencies of the situation made that course imperative.' '[T]he burden is on those seeking the exemption to show the need for it.'" (Fns. omitted.) (*Coolidge* v. *New Hampshire* (1971) 403 U.S. 443, 455 [29 L.Ed.2d 564, 576, 91 S.Ct. 2022].)

At this point we advert to the positions taken on this appeal with respect to the record made in the trial court. There were Penal Code section 1538.5 motions below directed at several different search and seizure incidents. The first motion challenged the seizure of the bodies of Verna and Douglas from the mortuary in Westwood on January 8, 1981 by the Santa Barbara sheriff-coroner. A warrant had been secured by them prior to their seizure of the bodies, a warrant issued by magistrate Slater. The affidavit accompanying the application for the warrant consisted of a report of the Hinman telephone call on January 3, 1981, and alluded to information which had "filtered through" to the sheriff's office. The learned trial judge properly ruled that the search warrant obtained was not based on probable cause, i.e., on articulated circumstances which would give rise to a reasonably held suspicion of criminal activity. ■ A phone call from an untested informant does *not provide the probable cause which supports the issuance of a constitutionally valid search warrant.* (Witkin, Cal. Criminal Procedure (1983 Supp.) pt. II, § 978, p. 204.) However, he also ruled that *no* warrant was required at all, under California statutory law.

Both the Attorney General and defendant's appellate attorneys agree that the warrant which issued did not conform to the traditional "probable

cause" standard, and both assert that we are bound by the trial court's ruling on this issue. (We agree that we are so bound. *People* v. *Lawler* (1973) 9 Cal.3d 156, 160 [107 Cal.Rptr. 13, 507 P.2d 621]; *People* v. *North* (1981) 29 Cal.3d 509, 513 [174 Cal.Rptr. 511, 629 P.2d 19]. That, however, does not dispose of the matter of the warrant.) Both sides then retreat to extreme positions; the Attorney General claiming that there is no constitutional problem arising from the seizure of Verna and Douglas, and defendant claiming violation of Fourth Amendment rights which, if recognized, would have compelled exclusion of the evidence derived from the second autopsies at the trial of the cause.

No argument has been advanced here that the seizure, which was subject to both federal and state constitutional guarantees, was dictated by exigency, a recognized exception to protection from governmental intrusion. (*Michigan* v. *Tyler* (1978) 436 U.S. 499 [56 L.Ed.2d 486, 98 S.Ct. 1942].) The record discloses that prior to the seizure the sheriff had contacted the mortuary and had directed that the bodies be preserved at low temperatures until a warrant could be sought and the bodies obtained; the mortician had agreed to do this. It appears, therefore, that this exception has no application to the facts before us. The record also discloses that the warrant which was issued was obtained at the suggestion of the mortician, who was reluctant to relinquish possession of Verna and Douglas without one.

■ Defendant asserts that the seizure of the bodies by the sheriff-coroner while carrying out responsibilities of the *coroner* constitutes state action, whether characterized as an administrative procedure or criminal investigation, subject to the Fourth Amendment. We agree. (*Mapp* v. *Ohio* (1961) 367 U.S. 643 [6 L.Ed.2d 1081, 81 S.Ct. 1684, 84 A.L.R.2d 933]; and see *New Jersey* v. *T.L.O.* (1985) — U.S. — [83 L.Ed.2d 720, 105 S.Ct. 733].)

In the case at bench, the "state action" involved must be viewed in conjunction with the statutory scheme describing the duties of a coroner and the procedures to be followed. It is clear that the initial responsibility placed upon a coroner is, by nature, investigatory, i.e., to seize the remains of a decedent and to determine, if possible, the cause of death. The consequences of the investigation cannot be known until the investigation is complete; it may or may not ultimately result in further activity by law enforcement personnel. Thus, the coroner's search and seizure of the bodies herein was primarily an *administrative* seizure and search. The United States Supreme Court held in *Camara* v. *Municipal Court* (1967) 387 U.S. 523 [18 L.Ed.2d 930, 87 S.Ct. 1727] that warrantless searches by governmental inspectors for the purpose of enforcing administrative regulations were as subject to the Fourth Amendment protection as those by law enforcement personnel conducting a criminal investigation. This principle has been applied, wheth-

er the search be of a private residence (*Camara*) or of a commercial establishment. (*See* v. *City of Seattle* (1967) 387 U.S. 541 [18 L.Ed.2d 943, 87 S.Ct. 1737].) It was reaffirmed by the high court in *Marshall* v. *Barlow's, Inc.* (1978) 436 U.S. 307, 312 [56 L.Ed.2d 305, 311, 98 S.Ct. 1816], wherein it was declared that "the Fourth Amendment prohibition against unreasonable searches protects against warrantless intrusions during civil as well as criminal investigations. *Ibid.* The reason is found in the 'basic purpose of this Amendment . . . [which] is to safeguard the privacy and security of individuals against arbitrary invasions by government officials.' [Citation.]"[3]

*Camara, supra,* 387 U.S. 523, also recognized, however, the importance of the personal security afforded citizens by fair and uniform enforcement of health and safety regulations, and declared that "In cases in which the Fourth Amendment requires that a warrant to search be obtained, 'probable cause' is the standard by which a particular decision to search is tested against the constitutional mandate of reasonableness. To apply this standard, it is obviously necessary first to focus upon the governmental interest which allegedly justifies official intrusion upon the constitutionally protected interests of the private citizen. . . . [¶] The primary governmental interest at stake [in many administrative searches] is to prevent even the unintentional development of conditions which are hazardous to public health and safety. . . ." (*Id.,* at pp. 534-535 [18 L.Ed.2d at p. 939].)

The *Camara* court concluded that area inspection, in terms of housing, was a "reasonable" search of private property within the meaning of the Fourth Amendment, and that " 'probable cause' to issue a warrant to inspect must exist if *reasonable legislative or administrative standards for conducting an area inspection are satisfied with respect to a particular dwelling. . . .* It has been suggested that so to vary the probable cause test from the standard applied in criminal cases would be to authorize a 'synthetic search warrant' and thereby to lessen the overall protections of the Fourth Amendment. [Citation.] But we do not agree. The warrant procedure is

---

[3]California courts have recognized this particular application of the Fourth Amendment. See *Salwasser Manufacturing Co.* v. *Municipal Court* (1979) 94 Cal.App.3d 223 [156 Cal.Rptr. 292], which relied on *Camara, See,* and *Marshall* for its holding.

There are also a series of cases embodying an exception to the principle prohibiting warrantless administrative searches, when the searches are directed toward a closely regulated industry which, by its very nature, requires unannounced visits from governmental agents. Such cases are *Colonnade Corp.* v. *United States* (1970) 397 U.S. 72 [25 L.Ed.2d 60, 90 S.Ct. 774] (liquor licensees); *United States* v. *Biswell* (1972) 406 U.S. 311 [32 L.Ed.2d 87, 92 S.Ct. 1593] (licensed firearm dealers); and *Donovan* v. *Dewey* (1981) 452 U.S. 594 [69 L.Ed.2d 262, 101 S.Ct. 2534] (underground and surface mines). In California, the exception has been extended in *People* v. *Firstenberg* (1979) 92 Cal.App.3d 570 [155 Cal.Rptr. 80] (nursing home records) and *Betchart* v. *Department of Fish and Game* (1984) 158 Cal.App.3d 1104 [205 Cal.Rptr. 135] (wildlife conservation).

designed to guarantee that a decision to search private property is justified by *a reasonable governmental interest.* But reasonableness is still the ultimate standard. If a valid public interest justifies the intrusion contemplated, then there is probable cause to issue a *suitably restricted* search warrant." (*Id.,* at pp. 538-539 [18 L.Ed.2d at pp. 940-941].) (Italics added.)

In *Marshall, supra,* 436 U.S. 307, a case involving a governmental attempt to search business premises to enforce provisions of the Occupational Safety and Health Act of 1970 (OSHA) without a warrant, the high court majority affirmed the application of the Fourth Amendment warrant requirement, again pointing out that "[w]e are unconvinced, however, that requiring warrants to inspect will impose serious burdens on the inspection system or the courts, will prevent inspections necessary to enforce the statute, or will make them less effective." (*Id.,* at p. 316 [56 L.Ed.2d at p. 314].) The opinion further states that "The authority to make warrantless searches devolves almost unbridled discretion upon executive and administrative officers, particularly those in the field, as to when to search and whom to search. A warrant, by contrast, would provide assurances from a neutral officer that *the inspection is reasonable under the Constitution, is authorized by statute, and is pursuant to an administrative plan containing specific neutral criteria.*" (*Id.,* at p. 323 [56 L.Ed.2d at pp. 317-318]; italics added.) There is some dispute on the federal high court concerning the necessity for and the nature of an administrative search warrant issued pursuant to what is perceived as a lower level of "probable cause." However, the majority in *Marshall* supported just that, and found it "reasonable."

In California, title 13, "Inspection Warrants" was added to the Code of Civil Procedure in 1968.[4]

These sections set forth in footnote 4, reflect recognition that the Legislature has determined that an administrative search may be made in California with an "inspection" warrant pursuant to the guidelines of *Camara,* thereby allowing carefully regulated governmental intrusion to prevent cer-

---

[4]Section 1822.50 of that code provides that "An inspection warrant is an order, in writing, in the name of the people, signed by a judge of a court of record, directed to a state or local official, commanding him to conduct any inspection required or authorized by state or local law or regulation relating to building, fire, safety, plumbing, electrical, health, labor, or zoning." Section 1822.51 states that "An inspection warrant shall be issued only upon cause, supported by affidavit, particularly describing the place, dwelling, structure, premises, or vehicle to be searched and the purpose for which the search is made. . . ."

Section 1822.52 declares that "Cause shall be deemed to exist if either reasonable legislative or administrative standards for conducting a routine or area inspection are satisfied with respect to the particular place, dwelling, structure, premises, or vehicle, or there is reason to believe that a condition of nonconformity exists with respect to the particular place, dwelling, structure, premises, or vehicle."

tain enumerated hazards without sacrificing continuing concern about arbitrary invasions of the right to privacy by governmental officials.

In the case at bench, the relevance of these developments in the law of search and seizure is manifest. As we have said, the initial seizure and search by a coroner in compliance with his statutory duty and in furtherance of a compelling social interest, is administrative in nature, and one that may or may not lead to criminal investigation. Conceptually, it is not unlike the action of a police officer who temporarily detains a citizen on the street for a reason which may not meet the traditional "reasonable cause" standard; such detentions have been held constitutionally permissible. (*Terry* v. *Ohio* (1968) 392 U.S. 1 [20 L.Ed.2d 889, 88 S.Ct. 1868].)

As with the police officer, the coroner's function at the moment of the seizure, is to develop facts, information necessary to the safety of all citizens. The sheriff-coroner of Santa Barbara County was engaged in such an enterprise when a warrant was obtained and seizure of the bodies of Verna and Douglas was effectuated. The fact that the interest of Santa Barbara officials may have been increased by the telephone call from Hinman or other rumors is immaterial. The drownings had occurred within their jurisdiction, and the deaths were of a nature specifically enumerated in the statute mandating the coroner to fulfill his function. These circumstances alone were sufficient to justify the seeking of a warrant supported by a lower level of probable cause by the sheriff-coroner, as was done in this matter. The fact that apparently the mortician, who had responsibility for Verna and Douglas, asked that the Santa Barbara personnel obtain a warrant, only emphasizes the preferred status afforded to official action taken *after* submission of the matter to a neutral source, a magistrate. As a practical matter, it could protect any mortuary from claims of negligence or intentional wrongdoing with respect to the particular remains in question.

■ We have examined the affidavit and the warrant issued allowing the seizure of the bodies of Verna and Douglas. While we agree that it did not meet the *traditional* "reasonable cause" standard, it met a less rigorous administrative "probable cause" standard. It did acquaint the magistrate with the *essential* facts of the situation: drownings which had occurred in Santa Barbara County. The recitation of these essential facts justified the issuance of the warrant to seize the bodies. The warrant defined a situation set forth in the statutory scheme concerning coroners which required official action. We conclude that the permitted action was a reasonable exercise of governmental power under the United States Constitution; authorized by statute "pursuant to an administrative plan containing specific neutral criteria." (*Marshall* v. *Barlow's, Inc., supra,* 436 U.S. 307 at p. 323 [56 L.Ed.2d at p. 318].) It was a justifiable intrusion into defendant's right of

privacy, in view of the compelling governmental interest involved. As sensitive as the feeling of the living next-of-kin may be on the occasion of death (*Allen* v. *Jones, supra,* 104 Cal.App.3d 207), the societal interest must prevail.

In summary we hold that a sheriff-coroner, like other governmental officials, is subject to the Fourth Amendment, United States Constitution, and the California Constitution (art. I, § 13) as well. Such an officer may seize and search the bodies of dead persons which are in the custody of private citizens after making application for and obtaining a warrant which recites the *jurisdictional* facts upon which he relies to justify the search and seizure.

In the case at bench, the warrant obtained *did* meet the requisite standard for issuance; since we conclude that issuance was "reasonable," and not in violation of the Fourth Amendment, United States Constitution, defendant's contention in this regard must fail.

## II.

Defendant secondly contends that the sheriff-coroner's action in undertaking the second autopsies and then failing to preserve the bodies denied him due process of law. He asserts that, if it was permissible for the Santa Barbara County sheriff-coroner to seize and search the bodies, the People were under a duty to take reasonable steps to preserve the bodies and acquaint defendant with the fact that the bodies had been reautopsied, because it was possible that further examinations of them, conducted on defendant's behalf, might have yielded evidence favorable to the defense. Defendant maintains that the bodies should not have been, as they were, released back to the mortuary by the sheriff-coroner, knowing that they were scheduled for cremation, without making the requisite disclosure. Defendant did arrange for their cremation upon their return, assertedly unaware of what had occurred. Defendant claims he was not made aware of the second autopsies until the filing of the murder charges against him.

The nature of the government's duty to preserve material evidence was summarized in *People* v. *Nation* (1980) 26 Cal.3d 169, 175 [161 Cal.Rptr. 299, 604 P.2d 1051], as follows: "It is clear that the Constitution does not require the prosecution to make a complete and detailed accounting to the defendant of all police investigatory work on a case. (*Moore* v. *Illinois* (1972) 408 U.S. 786, 795 [33 L.Ed.2d 706, 713, 92 S.Ct. 2562].) Yet it is well established that the suppression by the state of evidence favorable to an accused, after a request therefor, violates due process, irrespective of the good faith of the prosecution. (*Brady* v. *Maryland* (1963) 373 U.S. 83, 87 [10 L.Ed.2d 215, 218, 83 S.Ct. 1194].) This court has recognized the

prosecutor's duty to disclose such material evidence favorable to the accused even in the absence of a request from the defense. (*In re Ferguson* (1971) 5 Cal.3d 525, 532 [96 Cal.Rptr. 594, 487 P.2d 1234].) In *People v. Hitch* (1974) 12 Cal.3d 641, 650 [117 Cal.Rptr. 9, 527 P.2d 361], we held that the obligation to disclose the existence of material evidence places on the state a correlative duty to preserve such evidence even without a request therefor,[1] and directed that in the future law enforcement agencies take reasonable measures to ensure its adequate preservation." The footnote (fn. 1) which accompanies this text is also instructive: "The present [Nation] case is typical of the problem covered by *Hitch,* in that defendant here was not charged at the time the police physician obtained the semen sample. If a request were a condition to the duty to preserve, the duty might not arise until it became impossible of performance." (See also *People v. Moore* (1983) 34 Cal.3d 215 [193 Cal.Rptr. 404, 666 P.2d 419], applying the *Hitch* principle to the loss, by government, of a urine sample.)

Defendant concedes that there are several California decisions which hold that law enforcement personnel have no duty to preserve dead bodies in order that they might be examined upon a defendant's behalf. (See, e.g., *People v. Vick* (1970) 11 Cal.App.3d 1058 [90 Cal.Rptr. 236] and *People v. McNeill* (1980) 112 Cal.App.3d 330 [169 Cal.Rptr. 313].) In *People v. Hogan* (1982) 31 Cal.3d 815, 851 [183 Cal.Rptr. 817, 647 P.2d 93], the duty to preserve material evidence was recognized but not applied in that case because there was no showing made that the evidence sought (but not developed by the prosecution) "could have produced favorable evidence on the issue of guilt. [Citation.]"

In *People v. McNeill, supra,* 112 Cal.App.3d 330, 337-338, the problem which arises when the "material evidence" is a dead body was addressed in this manner: "'As reflected in our laws, our society extends more respect to a dead body than to other physical evidence. [Citation.]' [Citations.] Unlike a corpse, most physical evidence is not in a state of decay and is susceptible to examination without 'outrage to the emotional feelings of the living.' [Citation.] [¶] Defendant emphasizes that the victim's body could have been preserved without embalming for at least 20 days in cold storage; he complains that notwithstanding, the body was released to the victim's family immediately after the autopsy and that law enforcement agents did not instruct that the body should not be cremated. Quite apart from its more ghoulish implications, defendant's criticism overlooks the fact that prosecutorial agencies have no right to custody of the remains of a deceased; therefore no duty of preservation arises. As noted in *Vick, supra,* [11 Cal.App.3d 1058 (90 Cal.Rptr. 236)] Health and Safety Code section 7102 provides a right of custody in homicide cases to the coroner and not to any other person or official (*Vick,* at p. 1065). After the autopsy or investigation

is completed by the coroner, the right to control disposition of the remains of a deceased and the duty of internment devolve on the family of the deceased. [Citations.] . . ." The *McNeill* court goes on to state that, "Even assuming a right in law enforcement officers to control disposition of the victim's remains, there is no showing that they should have appreciated potential value to defendant of fingernail scrapings from the victim. [Citation.]"

Thus *McNeill* emphasizes, as did *Hogan,* the burden placed upon a defendant in a criminal case to demonstrate the potential value access to the material evidence in question could have had, in assessing the seriousness of the claimed denial of due process. In his briefing on this issue, defendant in the case at bench does not specify any area of particular concern where a third examination of the bodies of Verna and Douglas might have produced exculpatory evidence; defendant takes the position that *any* reexamination on his behalf might reasonably have produced something favorable to his cause. The issue as presented is, therefore, unlike that raised in other cases where a particular sample reflecting a test of urine, semen or blood is the material evidence in question; we are asked to hold that, more likely than not, preservation of the bodies of Verna and Douglas and disclosure of the second autopsies to him would have helped defendant to prepare a better defense, that failure to do so offends notions of fair play, and that reversible error has occurred.

Defendant places great emphasis on the "concealment" of the second autopsies, or, more particularly, the failure of the sheriff-coroner to *tell* defendant what they were doing, thereby giving him the opportunity to consider his response. We have no doubt that the Santa Barbara authorities were reluctant in January 1981 to disclose to defendant their continuing interest in the events of January 2, 1981, at Bird Rock. The second autopsies did indeed ultimately prove material to the issues at the criminal trial; in fact it is fair to say that the evidence derived from the reexamination was crucial, in view of the conclusions drawn by Ventura County Coroner Duncan from the first autopsies.

Finally, defendant asserts that, despite the holding of the United States Supreme Court in *California* v. *Trombetta* (1984) 467 U.S. 479 [81 L.Ed.2d 413, 104 S.Ct. 2528], destruction of breath samples did not constitute a denial of the Fourteenth Amendment due process in that case, California retains the right to impose higher standards insofar as the preservation of material evidence is concerned. We agree that *Trombetta* does not dispose of the case at bench, because it was recognized therein that the problem of developing rules about preservation of evidence has yet to be fully addressed on the *federal* level.

■ We have concluded that there was no denial of due process in the case before us with the following considerations in mind:

*First,* defendant has not demonstrated with sufficient particularity the potential value of a third examination of these corpses.

*Second,* defendant *did* have the benefit of the information gathered in the first autopsies, information favorable to his position that the drownings were accidental rather than premeditated homicides. Defendant offered the testimony of the first coroner, Dr. Duncan, as well as other experts, concerning the initial determination of accidental death, although Dr. Duncan modified his conclusions at trial. Defendant was not in the position of having to challenge "unfriendly" findings of the second coroner *without any point of favorable reference.* In addition, Dr. Hunter, the Santa Barbara medical examiner, did preserve the samples and slides with which he supported his findings; complete discovery was allowed to defendant of these items.

*Third,* we do *not* rely on the premise, expressed in *Vick,* and to a lesser degree in *McNeill,* that a human body differs so greatly from other kinds of material evidence that special rules devolve upon disposition of same. As emotional as the situation of death may be, the sensitivities of the living must give way to the fundamental seriousness of inquiry into the cause of death, and we assume that in many cases family members would be extremely interested in the results of official investigations about this, despite their feelings of grief or loss. Despite the problem presented by the perishable nature of human remains, we have no doubt preservation could be achieved in a majority of situations; that is not the basis for our ruling here.

Finally, the ultimate issue upon which defendant's contention turns is *at what point* in a criminal investigation does the prosecution have a duty to inform persons outside that investigation, including possible suspects, of the path which they are following? We are not persuaded that some of the assumptions implicit in defendant's hindsight judgment of the conduct of Santa Barbara law enforcement officials with respect to the second autopsies survive examination. Defendant suggests that law enforcement's suspicions had irrevocably fastened on defendant as the human responsible for Verna and Douglas' premortem injuries. They denied it. He also asks us to assume that the Santa Barbara medical examiner *would* have destroyed evidence tending to support Dr. Duncan's initial findings. There is *no* evidence that Dr. Hunter would risk a solid professional reputation by engaging in conduct of such a reprehensible nature.

As with any constitutional analysis, it is essential to view the situation not in the abstract, but in practical terms, focusing on it as it existed *at the time*

Dr. Hunter concluded his reevaluations. All that was really known to law enforcement personnel was that a substantial question had arisen about the cause of death of two persons reportedly drowned in a boating accident. There were a number of possible explanations to be explored, a ruling-out process accomplished only by further investigation, before suspicion became a viable theory—and before suspicion narrowed down to the defendant as the perpetrator of premeditated murder. Ruling out possibilities before formulating concrete suspicions are common elements in any good faith, competent and thorough criminal investigation process. We cannot say that under the totality of the circumstances presented here that it was reasonable and necessary to expect the law enforcement personnel to advise *anyone* not officially involved in the investigation, including the defendant, of the revelations of the second autopsies of Verna and Douglas, and to preserve their bodies.

Defendant's claim of denial of due process cannot, therefore, prevail.

### III.

Defendant thirdly contends that the trial court erred in permitting the jury to consider evidence of experiments. Experimental evidence has long been permitted in California trial courts; in *People* v. *Spencer* (1922) 58 Cal.App. 197 [208 P. 380], an experiment was permitted concerning whether a person's screams could be heard under certain conditions. And in *People* v. *Carter* (1957) 48 Cal.2d 737, 749-751 [312 P.2d 665], the California Supreme Court approved the introduction of an experiment involving blood stains. However, as *People* v. *Hogan, supra,* 31 Cal.3d 815, makes clear, the qualifications of those individuals testifying concerning experimentation outside of court must be established with some particularity.

In *Culpepper* v. *Volkswagen of America, Inc.* (1973) 33 Cal.App.3d 510, 521 [109 Cal.Rptr. 110], it is declared that "Admissibility of experimental evidence depends upon proof of the following foundational items: (1) The experiment must be relevant (Evid. Code, §§ 210, 351); (2) the experiment must have been conducted under substantially similar conditions as those of the actual occurrence [citation]; and (3) the evidence of the experiment will not consume undue time, confuse the issues or mislead the jury [citation]. [¶] In the case of experimental evidence, the preliminary fact (see Evid. Code, § 403, subd. (a)(1)) necessary to support its relevancy is that the experiment was conducted under the same or similar conditions as those existing when the accident took place. The standard that must be met in determining whether the proponent of the experiment has met the burden of proof of establishing the preliminary fact essential to the admis-

sibility of the experimental evidence is whether the conditions were *substantially identical, not absolutely identical.* [Citation.]'' (Italics added.)

The admissibility of experimental evidence is within the trial court's discretion; that discretion must be employed with considerable caution in this area, however, bearing in mind the weighing process of Evidence Code section 352. ''Section 352 permits the trial judge to strike a careful balance between the probative value of the evidence and the danger of prejudice, confusion and undue time consumption. That section requires that the danger of these evils substantially outweigh the probative value of the evidence. This balance is particularly delicate and critical where what is at stake is a criminal defendant's liberty.'' (*People* v. *Lavergne* (1971) 4 Cal.3d 735, 744 [94 Cal.Rptr. 405]; and see also *People* v. *Guillebeau* (1980) 107 Cal.App.3d 531 [166 Cal.Rptr. 45].)

In our view, the trial court, undoubtedly with the principles we have just discussed firmly in mind, adopted the most conservative possible approach in admitting experimental evidence, hedging the admissions with limitations and admonitions unnecessarily narrow—and often unduly favorable to defendant. Experimental evidence is only admissible *if relevant* and that means that it must have ''any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.'' (Evid. Code, § 210.) As we shall explain, it is our conclusion that a substantial portion of the experimental evidence admitted was highly relevant to issues in dispute and met the other requirements summarized in *Culpepper, supra,* 33 Cal.App.3d 510, as well.

A. *Testing of the Dory*

Testimony concerning the testing of the Roehler dory in July 1981 was admitted by the trial court after a foundational hearing pursuant to Evidence Code section 402 had been held. The details attendant on the testing have already been set forth herein. The trial court judge was satisfied that the testing had been conducted under sufficiently similar conditions to those extant on January 2, 1981.

The evidence was admitted to determine the stability of the Roehler dory. Defendant claims that this fact had no relevance, which is a claim without merit. As we have said, Evidence Code section 210 tells us that '' '[r]elevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.'' The characteristics of the Roehler dory, its tendency to capsize or right itself under certain weather conditions, was such a disputed fact in

criminal litigation where a jury was resolving a fundamental issue as to whether certain events had occurred accidentally or were part of a premeditated murder plan.

Defendant points out that the trial court's ruling was based on the assumption that testing of the dory was done under the worst possible weather conditions, and that he instructed the jury to that effect. This was erroneous and reflects misunderstanding of the *Culpepper* requirements. The prosecution was not under a duty to test the dory under the worst possible weather conditions, but merely to meet the requirement that the test be conducted under substantially similar conditions. This they did. We do not find the inaccurate reasoning underlying the admission grounds for reversal, however, because (1) the evidence met the basic requirements set forth in *Culpepper* and (2) we doubt that the jury was misled because ample evidence was presented to them concerning the actual weather conditions extant both on January 2, 1981 and during the July 1981 testing.

Defendant also claims that, due to a storm moving toward the Santa Barbara coast on January 2, 1981, the weather conditions were not substantially similar to those during the July 1981 tests. The record does not support defendant's claims concerning weather conditions on January 2, 1981, and during the July 1981 tests. While witnesses disagreed on exactly how rough the seas were around Bird Rock on January 2, 1981, the assessment accepted by the trial judge was that the conditions were at least no rougher than those of July 1981, and more likely than not the July conditions presented more difficulty for the dory than those of January. That assessment had substantial evidentiary support. "Substantially similar" does not mean precise duplication. We have determined that the dory testing experiment testimony was relevant, involved substantially similar conditions, and that the probative value outweighed the possible prejudicial effect. What the dory testing tended to show was that it was very unlikely that the dory had capsized accidentally; that it had been deliberately turned over, intentionally so. Further, it was established that the slowness with which it turned over should have allowed the persons in the boat to swim free of it. It is, of course, highly significant that the testing in this case was done with the identical boat used by defendant, Verna, and Douglas when the fatal events occurred. Use of the identical equipment is not a requirement to introduce experimental evidence, but it does produce evidence more solid and credible particularly when coupled with testimony, as it was here, concerning the possession of the boat by the prosecution from approximately January 15, 1981 forward. We find no error in the ruling as to the dory tests.

### B. *Testing of the Dummy*

Both this section and the one following, involve a slightly different aspect of the use of experimental testimony in a criminal trial. The issue presented

is the propriety of introducing into evidence conclusions resulting from experiments involving new, rather than well-established techniques.

In *People* v. *Kelly* (1976) 17 Cal.3d 24, 30 [130 Cal.Rptr. 144, 549 P.2d 1240], the California Supreme Court was assessing the admissibility of a new technique known as "voiceprint." In that case, the court declared that "admissibility of expert testimony based upon the application of a new scientific technique traditionally involves a two-step process: (1) the *reliability of the method* must be established, usually by expert testimony, and (2) the witness furnishing such testimony must be properly *qualified as an expert to give an opinion* on the subject. [Citations.] Additionally, the proponent of the evidence must demonstrate that correct scientific procedures were used in a particular case. [Citations.]" The *Kelly* court then quoted from an early case on the subject, a quotation which bears repeating here. It was said, in "*Frye* v. *United States* (D.C. Cir. 1923) 293 F. 1013, 1014, involving the admissibility of polygraph tests: 'Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be *sufficiently established to have gained general acceptance in the particular field in which it belongs.*' (Italics added.)" (*Ibid.*)

As may be seen, the test is a conservative one, conveying to the trial courts faced with such admissibility problems an appropriate sense of caution.

It is important to note that, in this case, the admissibility problem in connection with use of the dummy was distinctly different from that involved in *Kelly* or *Frye*. We are not asked here to analyze and deliver an opinion on the emerging field of biomechanics, the application of engineering principles to biology, and we decline to do so—the *Kelly* and *Frye* courts undertook a far broader task than is required here.

 Some other observations are pertinent about the evidence with which we are concerned here. The testing concerning the dummy, and the potential force applied to the head of the dummy and the dory, was but a small part of the presentation of evidence in this case, rather than the *sine qua non* of the case against the defendant, so some perspective is in order. In addition, the trial court judge made an important ruling with respect to the experimental evidence testimony that should be noted: he ruled that the engineering experts could testify concerning engineering principles and that only appropriately qualified medical experts could testify concerning the

*injuries* to human heads involved. We are considering a situation, therefore, where our assessment is a limited one, and we make it mindful of the conservative stance which flows from the teaching of *Kelly* and *Frye*.

In the case at bench, the prosecution was attempting to prove that Douglas' head injuries could not have been caused by the force generated by the collision of the boy and the dory. Testimony was admitted concerning the experiments conducted by Dr. Keith Hickman, using a live subject about the age and size of Douglas, to measure the velocity of the boy, with a flotation jacket similar to that Douglas was wearing, rising in the water to the surface after immersion. The experiments were conducted in a saltwater holding tank on the UCSB campus to determine the maximum vertical speed of a boy popping to the surface. These tests and those involving the dory resulted in the determination of a combined closing velocity in a collision, of 6.55 feet per second. The trial judge felt this information could be given the jury, with an accompanying precautionary instruction, and subject to cross-examination. As to this aspect of the testing, there was testimony at the 402 hearing that the techniques involved were reliable and well established examples of the use of engineering principles.

Understandably, a live subject could not be used to attempt to measure the force generated by a collision between the dory and the human head of a small boy. An anthropomorphic dummy, one designed to have the same weight and mass distribution as a living person, in this case the dead person of Douglas Johnson, was used in the testing at an engineering facility, "Minicars." A number of experimental collisions between the dummy and the Roehler dory were enacted, using the velocity figures provided initially by Dr. Hickman. After some constancy had been achieved in results, Dr. Ward ascertained that the maximum force generated by these experimental collisions simply could not produce a force *anywhere near enough* to produce Douglas' head injuries. It is of significance that the testing involved a wide range of velocities and that the conclusion reached by Dr. Ward was supported by the testimony of two medical experts, Drs. Kolp and Smith, both of whom were experts on traumatic head injuries. Dr. Kolp, who was present during the dummy testing, was particularly well qualified to testify concerning traumatic head injuries, due to his extensive emergency medicine experience.

The case of *People* v. *Dellinger* (1984) 163 Cal.App.3d 284 [209 Cal.Rptr. 503], was raised by defendant at oral argument concerning the reliability of evidence produced from the testing of anthropomorphic dummies. In that case, the appellate court reviewed evidence regarding testing by Dr. Ward concerning injuries to a two-year-old child. Tests were conducted to determine the amount of force generated by a fall down stairs, in

connection with the child's injuries. The *Dellinger* court reversed the conviction on the ground that the Ward evidence constituted evidence concerning new scientific techniques, and did not meet the stringent requirements of *Kelly.*

However, we agree with the Attorney General that there is no similarity between the techniques employed in *Dellinger* and those used in the case at bench; some of the distinctive, limiting factors in the case at bench have already been discussed. In *Dellinger,* the testing consisted of a police officer's throwing the dummy down some stairs, without any trajectory analysis. We agree with the *Dellinger* majority that this did not remotely constitute a scientific procedure of any reliability. Contrast, however, the use in the present case of correct engineering principles to establish velocity figures before the dummy was introduced into the experimental process. In the present case, there was extensive preliminary testimony by Dr. Dennis Schneider, an expert in the field of soft tissue mechanics, who supported the reliability of the method used to measure the velocity involved. In addition, the prosecution had offered the testimony of a retired engineering professor, William Thompson, who confirmed the accuracy of the combined closing velocity figures obtained by both Drs. Hickman and Ward.

Considerable time at trial was spent on Dr. Ward's considerable education and experience as an engineer specializing in structural dynamics, her additional education in medicine, and her more recent activities in the area of head trauma. We find no fault with these qualifications, bearing in mind the trial court's delineation between the engineering testimony and the medical testimony.

We have concluded that the *Kelly* test for the introduction of experimental testimony based on novel scientific techniques was not violated in the case at bench, taking into account the approach taken by the trial court in carefully limiting the manner in which the testimony could be presented. As we shall discuss, the evidence regarding the dummy was not the *basis* for the conclusion that the boy's head injuries were the result of premeditated murder, but this case is an example of using scientific evidence to *corroborate* the conclusions of Dr. Dewitt Hunter, the medical examiner pathologist.

C. *Patterns*

The trial court permitted Duane Mauzey, a criminalist with the California Department of Justice, to testify concerning his identification of a "pattern" of injury on Douglas' head, and his investigation of possible places where that pattern could be duplicated. Mauzey, a very experienced criminalist, candidly admitted that the investigation undertaken involved

new approaches in the area of criminal investigation. The problem with his testing and conclusions—that the injuries to Douglas most likely occurred in the dory—is that in no manner did it constitute the type of reliable scientific procedure envisioned by *Kelly* and *Frye*. There was no measurement of force by scientific method during Mauzey's experimentation. The situation is very similar to the lack of precision employed by the police officer in *Dellinger, supra,* 163 Cal.App.3d 284. There are other inherent difficulties involved in a process which involved subjective selection of locations where the testing was performed.

The evidence should not have been admitted. We are convinced, however, that the admission of the evidence was not sufficiently prejudicial to defendant to mandate reversal of the conviction. Honoring article VI, section 13 of the California Constitution and applying the test in *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243],[5] we conclude that it is not reasonably probable that the absence of this evidence would have changed the result reached by the jury.

## IV.

Defendant next contends that the jury was significantly misinstructed, and that the errors compel reversal. We disagree. Implicit in defendant's arguments concerning instructions is that the case against defendant was a thin circumstantial one, and that the guilty verdict was the result of nearly even balancing of the evidence by the jury. As we have explained, *infra,* there was substantial evidence in support of the jury verdict.

Defendant complains that the giving of CALJIC No. 2.62 was erroneous. That instruction read: "In this case defendant has testified to certain mat-

---

[5]Article VI, section 13 of the California Constitution mandates that: "No judgment shall be set aside, or new trial granted, in any cause, on the ground of misdirection of the jury, or of the improper admission or rejection of evidence, or for any error as to any matter of pleading, or for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice."

In *People* v. *Watson, supra,* 46 Cal.2d 818, the California Supreme Court defined the broad term "miscarriage of justice" as used in article VI, section 13: "A 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is *reasonably probable* that a *result* more favorable to the appealing party would have been reached in the absence of the error." (*Id.,* at p. 836.) Thus, as interpreted in *Watson,* article VI, section 13 allows an appellate court to reverse a verdict *only* if it first finds that the result probably would have been different had the error not occurred; otherwise, article VI, section 13 will not permit reversal. The court in *Watson* emphasized that reasonable *probability,* not mere *possibility,* of a different result is required to overturn a trial court verdict.

ters. [¶] If you find that he failed to explain or deny any evidence against him introduced by the prosecution which he can reasonably be expected to deny or explain because of facts within his knowledge, you may take that failure into consideration as tending to indicate the truth of such evidence and as indicating that among the inferences that may reasonably be drawn therefrom those unfavorable to the defendant are the more probable. [¶] In this connection, however, it should be noted that if a defendant does not have the knowledge that he would need to deny or to explain evidence against him, it would be unreasonable to draw an inference unfavorable to him because of his failure to deny or explain such evidence. [¶] The failure of a defendant to deny or explain evidence against him does not create a presumption of guilt, nor does it relieve the prosecution of its burden of proving every essential element of the crime and the guilt of the defendant beyond a reasonable doubt.''

Defendant takes the position that this instruction violated defendant's Fifth Amendment rights and further claims that the instruction encouraged the jury to equate nonevidence, i.e., failure to explain or deny, with the substantial evidence necessary in order to convict.

In *People* v. *Mayberry* (1975) 15 Cal.3d 143 [125 Cal.Rptr. 745, 542 P.2d 1337], a similar instruction was approved in the face of the Fifth Amendment self-incrimination argument made here. And in *People* v. *Saddler* (1979) 24 Cal.3d 671, 678-681 [156 Cal.Rptr. 871, 597 P.2d 130], CALJIC No. 2.62 was upheld by the California Supreme Court against renewed constitutional challenge. With respect to the claim that the instruction permits a shifting of the burden of proof, the *Saddler* majority pointed to the last paragraph of the instruction, which clearly restates that there is no diminution of the prosecutorial duty to persuade beyond a reasonable doubt that defendant is guilty as charged, even when the jury utilizes the instruction. (*Id.*, at pp. 679-680.)

The *Saddler* majority was careful to state that assessment of the evidence adduced during "the scope of relevant cross-examination" determines the applicability of the instruction in a given case; its use is thus limited, to protect against automatic widespread use by prosecutors to bolster "weak" cases. The trial judge makes a preliminary determination as a matter of law concerning the general applicability of the instruction, mindful of the state of the record; it is then within the province of the jury to utilize the instruction if they so choose. (*Id.*, at p. 682, fn. 8; CALJIC No. 17.31.)

If a defendant has not been asked an appropriate question calling for either an explanation or denial, the instruction cannot be given, as a matter of law.

If a defendant does not answer the question put to him because of some circumstance precluding his knowledge, such as an alibi placing him elsewhere, he is deemed to be denying guilt. (*Id.*, at p. 683.) Contradictory testimony by a defendant does not invoke the giving of CALJIC No. 2.62 (*People* v. *Peters* (1982) 128 Cal.App.3d 75, 86 [180 Cal.Rptr. 76]), nor does failure to recall specific details (*People* v. *De Larco* (1983) 142 Cal.App.3d 294 [190 Cal.Rptr. 757]). And in *People* v. *Haynes* (1983) 148 Cal.App.3d 1117, 1120-1122 [196 Cal.Rptr. 450], the court discussed the difficulties of defining terms which can arise in assessing a claim of error concerning the instruction, holding in that case that a defendant's "bizarre" explanation of events which led to a rape charge did not preclude giving the instruction. *Saddler, supra,* and later case law hold rather uniformly that if the instruction is erroneously given the jury, the appropriate inquiry becomes that enunciated in *People* v. *Watson, supra,* 46 Cal.2d 818, 836, i.e., whether a different result would have been reasonably probable in the absence of the error. (See fn. 5, *supra.*)

It can be said that the applicability of CALJIC No. 2.62 is peculiarly dependent on the particular facts of the case. ▮ The People, in the case at bench, point to various areas of testimony where defendant, on cross-examination, failed in their view to adequately explain circumstances of which he had knowledge, according to his own testimony: the capsizing of the dory in relatively calm seas, the bruises and injuries to the heads of both his wife and stepson; and the purchase of substantial amounts of life insurance at a time when there was a severe negative cash flow problem.

As we understand the evidence, the crucial questions asked of this defendant on cross-examination—which was lengthy—related to the *precise* circumstances existing *just prior to the capsizing of the dory, during the 60 seconds defendant claimed to be caught under the overturned boat, and just after defendant was able to get to the ocean surface and look around him.* The defendant's position on the condition of Verna and Douglas was that he simply did not know what had happened to them. The prosecution had introduced into evidence information about the weather and ocean (relatively calm), the dory (hard, if not impossible to turn over) and the health and swimming capabilities of defendant's companions (good); we know that Douglas was wearing a flotation jacket. Nothing in the record remotely hinted at any injuries sustained by Verna or Douglas prior to the outing in the dory—observed by either defendant or other family members on board the Perseverance. The prosecution had also introduced substantial and detailed medical testimony concerning premortem injuries found on both drowning victims in the same area of the body, the head and neck region.

The primary issue is whether, given all the evidence already adduced pertaining to the "precise circumstances" just prior to the 60-second evi-

dentiary gap, and just after, defendant's claim that *he didn't know* what happened was an explanation of these events which precluded the giving of CALJIC No. 2.62.

That instruction declares, in paragraph three, that "if a defendant does not have the knowledge that he would need to deny or to explain evidence against him, it would be unreasonable to draw an inference unfavorable to him because of his failure. . . ." Conversely, it would seem that a defendant's claim not to know is a credibility question; the state of his knowledge, what it was reasonable to expect that he *would* know, given the circumstances in which he was, was within the province of the jury to determine. The "sixty-second" gap, while a denial of sorts, cannot be logically equated with an alibi placing him across town. It has been said that "[i]t is entirely proper for a jury, during its deliberations, to consider logical gaps in the defense case. . . ." (*People* v. *Redmond* (1981) 29 Cal.3d 904, 911 [176 Cal.Rptr. 780, 633 P.2d 976].) We hold there is such a gap here.

This jury apparently did not find defendant's claim of lack of knowledge credible, in view of his presence on the scene. Having determined that his claim not to know was false, it was within their province to utilize CALJIC No. 2.62 if they chose to do so. We conclude that in the context of this case, the giving of CALJIC No. 2.62 was proper.

Defendant next contends that, under the circumstances of this case, it was improper for the trial court to give CALJIC No. 2.51, regarding motive. The jury was instructed that: "Motive is not an element of the crime charged and need not be shown. However, you may consider motive or lack of motive as a circumstance in this case. Presence of motive may tend to establish guilt. Absence of motive may tend to establish innocence. You will therefore give its presence or absence, as the case may be, the weight to which you find it to be entitled."

The jury had been instructed already that if it believed that the defendant had purchased the life insurance in good faith, relying upon professional advice given him, any error in the advice given had no significance.

 Defendant's specific argument about this instruction is that since resolution of the case compelled a choice solely between accidental death or premeditated first degree murder, it was wrong to instruct on motive. The People respond that defendant did not complain in the trial court when this instruction was given. Neither position has merit. Appellate courts review the instructions to a jury regardless of objection below because to do otherwise would reduce litigation to a hypertechnical game of some sort. (*People* v. *Hannon* (1977) 19 Cal.3d 588, 600 [138 Cal.Rptr.

885, 564 P.2d 1203].) As has been explained many times before, "[t]he trial court has the duty to instruct on general principles of law relevant to the issues raised by the evidence [citations] and has the correlative duty 'to refrain from instructing on principles of law which not only are irrelevant to the issues raised by the evidence but also have the effect of confusing the jury or relieving it from making findings on relevant issues.' [Citation.]" (*People* v. *Saddler, supra,* 24 Cal.3d at p. 681.) ▉▉ In the case at bench, substantial evidence had been received by the jury concerning the financial situation of defendant and Verna, because the prosecution had charged that defendant staged the accidental deaths of Verna and Douglas for the purpose of financial gain. Defendant's December 1980 purchase of large quantities of life insurance at a time when the family was experiencing severe negative cash flow problems was very much in issue at this trial. The fact that there were no issues related to other possible degrees of homicide did not make the instruction any less material. In our view, the trial court was clearly required to instruct on motive.

Defendant also asserts that the trial judge erred in instructing the jury on the difference between direct and circumstantial evidence. The proper instruction on the subject (CALJIC No. 2.00) was given the jury. However, the trial judge chose to attempt to illustrate the distinction between the two kinds of evidence by placing a pen in a wastebasket and drawing conclusions about that fact. Defendant argues that, by the example given, the jury may have been persuaded that they could convict without application of the reasonable doubt standard. We find the assertion one without merit. While the effort to demonstrate the distinction was not particularly illuminating, it must be viewed with some perspective. Perfection is often not possible, nor is it required. Moreover, even if giving the example was instructional error, it is not reasonably probable that defendant would, without it, have obtained a more favorable result. (*People* v. *Watson, supra,* 46 Cal.2d 818, 836; see fn. 5, *supra.*)

## V.

▉▉ Finally, defendant maintains that the evidence adduced below was insufficient to support the judgment of conviction. Earlier in this opinion we stated the appropriate standard of review by this court when such a claim is made: whether any rational trier of fact could have reached the result, in view of the whole record regarded in the light most favorable to the judgment.

Defendant attacks the prosecution's efforts to present scientifically oriented testimony of various kinds by duly qualified experts as some sort of show business proceeding that dazzled the jury and led to a wrong verdict.

While a small part of the experimental evidence adduced has not met muster in this court, the record simply contains, as it should—considering the nature and the severity of the offenses—an array of competent expertise offered for the purpose of supporting the charges made. Defendant presented considerable expert testimony also. The fact that there was disagreement between various experts on certain matters does not detract from the record collectively made in this case. Experts do not always agree.

When looking, however, at areas of agreement rather than areas of disagreement, we find that the prosecution's main thrust was that presented by Dr. Hunter's findings and testimony. This support for the prosecution case was not furnished by experimental testimony but was direct, expert, and to some degree, demonstrative evidence, further buttressed by the conclusions of other medical examiners of equivalent experience. Defendant has been unable to cast serious doubt on Dr. Hunter's unequivocal conclusion that Verna and Douglas sustained premortem head injuries that led to their deaths by drowning. The jury was entitled to adopt this conclusion, did so, and it constitutes substantial evidence in support of the verdict. We do not view the case as one of thinly constructed circumstantial evidence despite defendant's claim. Scrutiny of the entire record discloses a compelling case, rather than a flimsy one.

Defendant has argued in various ways throughout this litigation that he was required to present proof of innocence rather than be proved guilty beyond a reasonable doubt. Defendant chose to testify in his own behalf. The jury listened to his testimony and assessed his credibility against the background of what was known to them. The prosecution did not merely attempt to negate defendant's version of what occurred, but presented much positive evidence concerning the occurrence which, when pieced together, tended to (1) support the prosecution charges *and,* in the process (2) cast doubt on defendant's testimony.

The fact is, that given the surrounding circumstances proved by the prosecution—the weather, the condition of the boat, the condition of the participants, there was simply no rational explanation for the deaths of two persons, both with head wounds, and both dead of drowning—without the intervention of some additional element, i.e., some human intervention. Defendant's account simply added fuel to this conclusion, because had events transpired as defendant recounted, there was still no rational explanation of the results: his testimony demonstrated anew that the deaths would simply not have occurred if his testimony were the truth. Rejecting the possibility—unproved—of the external intervention of other human force (aside from defendant's use thereof), the jury adopted a rational conclusion and determined that defendant's credibility was in doubt. In short, the pros-

ecution developed a case not simply ruling out accident but one which demonstrated what actually did happen, i.e., that defendant, motivated by financial stress and greed, disabled his victims and caused them to drown. The prosecution met its burden of proving guilt beyond a reasonable doubt.

Despite the claims of error made by defendant, the protracted and hard-fought trial was one that required a series of difficult rulings and concentrated effort on all aspects of the trial by an able and conscientious trial judge. Actual trial, exclusive of pretrial motions, lasted about 70 days; over 160 witnesses were called and over 450 exhibits were received. The reporter's transcript on appeal was approximately 10,000 pages in length. A defendant is not entitled to a perfect trial, only to a fair one. Defendant Roehler was, in our view, fairly tried.

CALJIC No. 2.90 (1979 rev.) was requested by both parties and was given by the court. Twelve jurors, after consideration of all of the evidence, both direct and circumstantial, signified, by their unanimous verdict, that they possessed "an abiding conviction, to a moral certainty, of the truth of the charge[s]."

DISPOSITION

The judgment is affirmed.

Spencer, P. J., concurred.

**DALSIMER, J.**—I respectfully dissent.

The prosecution's case was predicated solely upon circumstantial evidence because the defendant was the only survivor and thus the only witness to what occurred on January 2, 1981. Because of the presumption of innocence afforded a defendant in a criminal case, it is required that, where the People's case rests exclusively or even substantially upon circumstantial evidence, that evidence must be irreconcilable with any rational conclusion other than defendant's guilt. Further, when relying on circumstantial evidence, the People must prove beyond a reasonable doubt each fact essential to complete the chain of circumstances that establishes defendant's guilt. (*People* v. *Watson* (1956) 46 Cal.2d 818, 830 [299 P.2d 243]; see Witkin, Cal. Evidence (2d ed. 1966) Introduction of Evidence at Trial, § 1136, pp. 1054-1055.)

It follows that defendant's guilt may not lawfully be established by the mere expedient of raising doubts concerning defendant's version of what occurred just prior to the drownings. A distinction crucial to the correct

resolution of this case should be noted here. The prosecution undertook the burden of persuading the jury beyond a reasonable doubt that defendant murdered his wife and stepson. If such persuasion was not achieved, then the jury was required to find the defendant not guilty even though it doubted the defendant's story and was not persuaded that he was innocent. (See 1 Jefferson, Cal. Evidence Benchbook (2d ed. 1982) Definitions and Distinctions, § 19.3, pp. 455-456.) The important distinction in criminal law between proof of guilt and proof of innocence was disregarded in this case. The People must prove defendant's guilt, but defendant has no burden whatsoever to establish his innocence. A jury must be convinced beyond a reasonable doubt to find a defendant guilty, but it need not be at all convinced of a defendant's innocence to find him not guilty. Stated differently, a finding of not guilty is *not* a finding of innocence.

It would appear from an overview of the trial in this case that the jury was subtly led to believe that, unless it found the defendant to be innocent, it was required to find him to be guilty. This result was attained by the erroneous reception of experiment evidence and compounded by a confusing and erroneous jury instruction and argument of counsel.

The evidence was uncontradicted that Verna and Douglas drowned, the first coroner who autopsied the bodies consistently maintaining that the deaths were accidental. The theory of the prosecution's case was that prior to death both defendant's wife and stepson suffered blows to their heads inflicted by the defendant and that these blows were the proximate cause of death. The People attempted to prove this theory by the introduction of three experiments and the so-called pattern evidence.

It is well established that in order for experiment evidence to be admissible, it must be shown that the evidence (1) is relevant, (2) was obtained under conditions substantially similar to those to which it is sought to be applied, and (3) will not cause undue delay in the trial or confuse the jury. (*Culpepper* v. *Volkswagen of America, Inc.* (1973) 33 Cal.App.3d 510, 521 [109 Cal.Rptr. 110].) The rollover, boy-rising, and dory-drop experiments were not relevant, were not conducted under substantially similar conditions, and unduly confused and influenced the jury. The pattern evidence not only failed to meet all three tests, but, as the majority concedes, did not even approach the level of reliable scientific evidence. (Maj. opn., *ante*, p. 391.)

## Substantial Similarity

In contrast to the experiments conducted in *Hasson* v. *Ford Motor Co.* (1977) 19 Cal.3d 530 [138 Cal.Rptr. 705, 564 P.2d 857, 99 A.L.R.3d 158],

*Culpepper* v. *Volkswagen of America, Inc., supra,* 33 Cal.App.3d 510, *Andrews* v. *Barker Brothers Corp.* (1968) 267 Cal.App.2d 530 [73 Cal.Rptr. 284], and *People* v. *Lockheed Shipbuilding & Constr. Co.* (1975) 50 Cal.App.3d Supp. 15 [123 Cal.Rptr. 778], none of the experiments commissioned by the People attempted to simulate defendant's description of what occurred at Bird Rock. The rollover tests did not involve a puppy jumping overboard, a man and a boy attempting to retrieve it, and a woman bumping into the man with all three people in a state of panic. Rather, the participants in the rollover tests created their own maneuvers in an effort to overturn the dory. Further, the jury was instructed that it could not consider the rollover tests as suggesting any similarity to any event which occurred on the day of the drownings.

Moreover, defendant's wife and stepson died on January 2, 1981, the middle of winter. The dory tests were conducted on July 17, 1981, the middle of summer. At the motion to exclude the tests, the trial court ruled that the weather conditions on the two days were substantially similar. However, at trial Mr. Strange, a meteorologist, testified that the two days were much different as far as the characteristics of the waves were concerned. In addition, there was uncontradicted evidence that on January 2 there was a wave train generated by a Pacific storm 1,900 miles from Bird Rock which caused long period swells with far more power than locally generated waves. No such condition was present when the rollover tests were conducted.

The court instructed the jury that it could not consider the rollover testing as suggesting that the weather and sea conditions were in any way similar on the two days. Yet substantial similarity in weather conditions was a preliminary fact which had to be established before the experiments were admissible. Since this key element was missing, it was error to allow the evidence to be presented to the jury.

Even more importantly, when the evidence of the rollover experiments was initially admitted, the experiments were ruled to have taken place under "the worst possible conditions," but there was not one shred of evidence offered at trial to support this contention. In spite of that absence of evidence, the prosecutor used this phrase throughout the trial and in both his opening statement and closing argument. This led the jury to believe that, if the dory would not turn over under "the worst possible conditions," it could not have capsized on January 2, 1981, in the manner in which defendant said it had.

The other two experiments were similarly defective. The boy-rising tests were conducted not in the ocean but in a saltwater tank on the University

of California Santa Barbara campus. The dory-drop tests consisted of dropping the dory on a dummy's head while it was floating in salt water. Neither of these tests included the slightest element of confusion or panic.

Although the experiment evidence failed to meet the criterion of substantial similarity and hence was improperly admitted, a major portion of the prosecution's case in chief consisted of testimony concerning the results of the various experiments. The error was not cured by the limiting instruction because, although not admitted for this purpose, the experiment evidence was specifically used to disprove defendant's version of the dory trip.

## RELEVANCY

Relevant evidence is defined as evidence ". . . having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) The authorities I have reviewed in which experiment evidence was held to be admissible involved in every instance evidence that was offered to prove a disputed fact at issue in the lawsuit. (*Hasson* v. *Ford Motor Co., supra,* 19 Cal.3d 530, 549-550 [tests of brake-fluid temperatures admitted to contribute to search for accident's cause]; *Culpepper* v. *Volkswagen of America, Inc., supra,* 33 Cal.App.3d 510, 521 [tests admitted to show the speed at which a Volkswagen would roll over]; *Andrews* v. *Barker Brothers Corp., supra,* 267 Cal.App.2d 530, 537-538 [evidence admitted to show stability of chair that had collapsed]; *People* v. *Lockheed Shipbuilding & Constr. Co., supra,* 50 Cal.App.3d Supp. 15, 36 [evidence supporting theory of cause of explosion].) In sum, experiment evidence is admissible only if it has any tendency in reason to prove or disprove a material fact upon which the outcome of the lawsuit depends. (*Culpepper* v. *Volkswagen of America, Inc., supra,* 33 Cal.App.3d 510, 522.) Here the experiments were specifically *not* admitted for this purpose.

### The Rollover

Prior to trial, the court ruled the rollover tests admissible for the limited purpose of demonstrating the stability of the dory under various circumstances including the "worst possible conditions." The court expressly stated that the tests would *not* be admitted "for the purpose of demonstrating the occurrence or nonoccurrence of the events at Little Scorpion Anchorage, or how they did occur, or did not occur . . . ." Moreover, the court later instructed the jury that the rollover tests were admitted to show the speed with which the dory would capsize *"under the circumstances of the experiment."* (Italics added.) It further admonished the jury that the tests were not admitted to demonstrate or suggest any similarity to any event which

occurred on January 2, 1981. Yet the determination of what occurred on January 2, 1981, was the ultimate issue at trial. It is thus clear that the rollover tests were not relevant and should not have been admitted.

There is, however, a more fundamental relevance problem with the rollover experiments. Through expert opinion based on the rollover experiments, the prosecution was allowed to adduce testimony that the cause of death could not have been accidental drowning.

Specifically, Dr. Hunter testified that a review of the film of the rollover tests led him to conclude that it is "entirely unlikely" that both of Verna's injuries were caused by the dory and that it was "very unlikely" an accident involving the dory caused Verna to drown. Dr. Petty testified that Douglas' injuries could not have been inflicted by the dory rolling over as he "saw it in the film and the videotape"; Criminalist Mauzey opined that, based on the films of the rollover tests, one but not two of the "sets" of marks on defendant's stepson could have been inflicted by the dory; and Dr. Davis, focusing his attention on the videotape that he saw of the dory-turning-over tests, stated that the boat did not inflict the injuries sustained by defendant's stepson. Thus, notwithstanding the fact that the rollover tests were not admitted to show what occurred at Bird Rock, they were expressly used for this purpose. The error in the admission of this evidence was twofold: (1) it placed upon the defendant the unconstitutional burden of proving his innocence and (2) it relieved the prosecution of the duty of proving defendant's guilt beyond a reasonable doubt. This violated two of the most basic tenets of our criminal justice system.

### The Dory-Drop and Boy-Rising Tests

The boy-rising tests were admitted by the court for the sole purpose of determining the acceleration rate produced between a boy rising in salt water and the dory closing on him. Similarly, the dory drop conducted at Minicars was admitted for the purpose of attempting to ascertain the maximum force and acceleration generated by the impact of a dory gunwale and a dummy head floating in salt water. However, the issues at trial did not involve collisions between floating dummies and the dory or ranges of closing velocities. The issue was whether on January 2, 1981, defendant unlawfully killed his wife and stepson with malice aforethought. Therefore, in order to be relevant, the evidence must have tended to show either that he did or that he did not. Since these tests were specifically neither offered nor admitted for this purpose, they were clearly irrelevant.

Moreover, the trial court itself instructed the jury that neither the videotapes of the experiments nor any testimony based on them could be consid-

ered "to demonstrate or suggest any similarity to any event which occurred on January 2, 1981."

However, once again, these tests were indeed used for the purpose of showing what did or did not occur at Bird Rock.

Specifically, Criminalist Mauzey testified that the combination of the rollover and dory-drop tests convinced him that the dory could not have caused the injuries sustained by defendant's stepson. This testimony was allowed notwithstanding the fact that, as the majority points out (maj. opn., *ante,* at pp. 388-389), the court had previously ruled that only qualified medical experts could testify concerning the injuries to human heads. The effect of the admission of these experiments and Criminalist Mauzey's testimony was to require defendant to prove his innocence rather than to require the People to prove his guilt. (See *People* v. *Briggs* (1967) 255 Cal.App.2d 497, 500 [63 Cal.Rptr. 111].)

### The Pattern Evidence

Criminalist Mauzey used autopsy photographs to trace a parallelogram "pattern" of marks on defendant's stepson's scalp, after which Los Angeles Coroner Thomas Noguchi knocked the carbon-paper-swathed head of a dummy against arbitrarily selected portions of the dory, rescue craft, Bird Rock, and Perseverance. From this exercise, Mauzey testified that the marks could only have been caused by someone hitting defendant's stepson twice on an isolated spot inside the dory.

*People* v. *Kelly* (1976) 17 Cal.3d 24 [130 Cal.Rptr. 144, 549 P.2d 1240] requires the proponent of scientific evidence involving a new process to establish the reliability of the method, the qualifications of the expert to give an opinion based on the experiment, and a demonstration that correct scientific procedures were used. (*Id.,* at p. 30.) As the majority concedes, the tests and conclusions reached by Mauzey failed to meet the above qualifications and should not have been admitted. (Maj. opn., *ante,* p. 391.)

However, contrary to the majority's assertion, the admission of this evidence was highly prejudicial. The jury was told that, because Mauzey had "approximated" and "estimated" a single place on the dory which could reproduce this one of countless possible patterns, murder was established beyond a reasonable doubt. Such "logic" hardly seems sufficient to keep a case in court, let alone to warrant a guilty verdict—and it is logic of the type our Supreme Court has firmly rejected. (*People* v. *Collins* (1968) 68 Cal.2d 319, 330-331 [66 Cal.Rptr. 497, 438 P.2d 33, 36 A.L.R.3d 1176].) This was an extremely close case, based solely on circumstantial evidence.

The jury deliberated a full week before reaching a verdict and relied heavily on the experiment evidence in doing so as demonstrated by its questions. The pattern evidence may have seemed to point strongly to defendant's guilt and was heavily relied upon by the People in argument. It was therefore prejudicial error to admit this evidence (see *People* v. *Hannon* (1977) 19 Cal.3d 588, 603 [138 Cal.Rptr. 885, 564 P.2d 1203]) because, contrary to the majority's position, it is extremely likely that "the absence of this evidence would have changed the result reached by the jury." (Maj. opn., *ante*, p. 391.)

## UNDUE CONFUSION

It is virtually impossible to discern the overall effect of the misuse of the experiment evidence. It was ubiquitous as it was presented to the jury at every turn.

Experiment evidence should not be admitted where it may be given undue weight. (See *People* v. *Kelly, supra,* 17 Cal.3d 24, 31-32.) That this jury was confused by and gave undue weight to these experiments is obvious from the fact that it asked to review them during deliberations *and requested permission to conduct its own experiments.*

These experiments involved very technical, difficult concepts not generally within the knowledge of laypersons. Moreover, although the jury was admonished as to the limited purpose for which the experiments were admitted, the prosecutor was allowed to roam far afield in his use of them during trial and during argument. Thus, it was prejudicial error to admit the experiment evidence because it is reasonably probable that the jury would have reached a result more favorable to the defendant had the tests been excluded. (*People* v. *Watson, supra,* 46 Cal.2d 818, 836.

The confusion engendered by the admission of this evidence is perhaps best demonstrated by the fact that the majority itself relies on the experiment evidence to establish what occurred at Bird Rock. (Maj. opn., *ante,* at p. 387.)

## CALJIC No. 2.62

It was error for the court to give CALJIC No. 2.62.

As this court has emphasized, "[o]f primary importance to the application of CALJIC No. 2.62 is whether the facts or evidence that defendant allegedly fails to explain or deny are within defendant's knowledge. [Citations.]" (*People* v. *De Larco* (1983) 142 Cal.App.3d 294, 309 [190 Cal.Rptr. 757].)

Here there was no evidence in the record that defendant did fail to explain or deny any fact *which was exclusively within his knowledge.* If defendant's statement concerning the atmosphere of panic and confusion surrounding the capsizing of the dory were believed, it would not be reasonable to expect him to be able to explain how the dory capsized and the bruises occurred, especially since the experts themselves could not agree as to whether the bruises were premortem or postmortem. "'No inference can be drawn if defendant does not have the knowledge necessary to explain or deny the evidence against him.' [Citations.]" *(People* v. *Saddler* (1979) 24 Cal.3d 671, 680 [156 Cal.Rptr. 871, 597 P.2d 130].) The fact that the prosecution disagreed with defendant's explanation of how he intended to make the premium payments did not warrant the instruction. The crucial fact is that defendant did offer an explanation. "[A] contradiction is not a failure to explain or deny." *(Id.,* at p. 682.)

Further, here, unlike in *Saddler,* the error was prejudicial. In *Saddler* there was an eyewitness and the jury deliberated for a mere hour and a half before reaching a verdict.

By contrast, here defendant was the only witness to the events at Bird Rock. The prosecution's case consisted entirely of circumstantial evidence buttressed by the improperly admitted experiments. Prejudice is shown by the following facts: the jury was sequestered and began deliberations on Monday morning; on Friday afternoon, before the Mother's Day weekend, having heard the instruction twice, having reviewed films of the various experiments, and having sought (unsuccessfully) to conduct experiments of its own, the jury finally asked the trial court to reread that portion of defendant's testimony concerning the dory trip. The request was made at 2:08 p.m. The 45 minutes of testimony were immediately reread, and the jury returned its verdicts at 4:10 that afternoon.

In other words, after deliberating for more than four days, the jury heard defendant's description of the events—the testimony upon which this instruction dwelled—and decided defendant's guilt in approximately one hour.

## CONCLUSION

"[I]n a review of error, the crucial question is not whether there is substantial evidence to support the judgment, but whether error affected the judgment." (Traynor, The Riddle of Harmless Error (1970) p. 28.) This was an extremely close case in which the properly admitted evidence was just barely sufficient to support the verdicts. Under these circumstances reversal is required because it is extremely likely that the erroneous instruc-

tion "tip[ped] the delicate balance of evidence against the defendant." (See *People* v. *Saddler, supra,* 24 Cal.3d 671, 686 (dis. opn. of Mosk, J.).)

I would reverse and remand.

A petition for a rehearing was denied May 22, 1985, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied August 19, 1985. Bird, C. J., Mosk, J., and Kaus, J., were of the opinion that the petition should be granted.