**Frederick George ROEHLER,
II, Petitioner–Appellant,**

**v.**

**Robert BORG; Attorney General of the
State of California, Respondents–
Appellees.**

**No. 90–56232.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 8, 1991.

Decided Sept. 24, 1991.

Dennis P. Riordan, Riordan & Rosenthal, San Francisco, Cal., and Wendy Cole Lascher and Edward L. Lascher, Lascher & Lascher, Ventura, Cal., for petitioner-appellant.

David F. Glassman, Asst. Atty. Gen., and Donald F. Roeschke, Supervising Deputy Atty. Gen., Los Angeles, Cal., for respondents-appellees.

---

Before REINHARDT and FERNANDEZ, Circuit Judges, and SMITH, District Judge.*

FERNANDEZ, Circuit Judge:

Frederick George Roehler, II appeals the district court's denial of his petition for habeas corpus relief. He argues that there was insufficient evidence to support his conviction of two counts of murder with special circumstances. We affirm.

## BACKGROUND

On January 2, 1981 Roehler, his wife Verna, and his stepson Douglas took a dory from their sailboat to Bird Rock. Later that day, the crew aboard a boat called "The Sound of Music" spotted the dory floating overturned. Roehler was floating nearby with Verna under one arm and Douglas under the other. The crew brought the three aboard, but they were unable to revive Verna and Douglas.

A preliminary autopsy revealed that Verna and Douglas died from accidental drowning. A second autopsy revealed head wounds and evidence that the wounds occurred before the drowning. The State of California charged Roehler with two counts of murder and three special circumstances. A jury convicted him of both counts and two of the three special circumstances. Roehler was sentenced to life in prison without the possibility of parole.

The California Court of Appeal affirmed the judgment,[1] but struck certain evidence that had been admitted at trial. The California Supreme Court denied review, and the United States Supreme Court denied certiorari. The district court denied Roeh-

ler's habeas corpus petition, and Roehler appeals.

## STANDARD OF REVIEW

■ We review de novo the district court's denial of a petition for a writ of habeas corpus. *McGuire v. Estelle*, 902 F.2d 749, 753 (9th Cir.1990), *cert. granted*, —— U.S. ——, 111 S.Ct. 1071, 112 L.Ed.2d 1177 (1991). In a challenge to a state criminal conviction, we grant habeas corpus relief if "upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S.Ct. 2781, 2791–92, 61 L.Ed.2d 560 (1979). We view the record in the light most favorable to the prosecution. *Id.*

For our purposes these standards are not affected by the fact that certain evidence which was before the jury was later stricken by the California Court of Appeal. What we must decide is whether the remaining evidence was sufficient to permit a reasonable juror to find Roehler guilty beyond a reasonable doubt.[2]

## DISCUSSION

■ Given our limited review function, we are constrained to affirm because a reasonable jury could find Roehler guilty beyond a reasonable doubt based upon the evidence in this case. The parties are as aware of the evidence as we are, so perhaps we should end this disposition at this point. No synopsis can present the full flavor of the evidence and it is inevitable that some nuances will appear to have been overlooked. Nevertheless, out of respect for the seriousness of this matter we will

FYCA could be considered at sentencing for a later crime. *Campbell*, 724 F.2d at 813.

\* The Honorable Fern M. Smith, United States District Judge for the Northern District of California, sitting by designation.

1. *People v. Roehler*, 167 Cal.App.3d 353, 213 Cal.Rptr. 353, *cert. denied*, 474 U.S. 1021, 106 S.Ct. 571, 88 L.Ed.2d 556 (1985).

2. The stricken evidence was by a criminalist with the California Department of Justice, Dwayne Mauzey. His testimony was that he thought the injuries to Douglas' head were in a kind of pattern. Thus, Mauzey took a dummy

with a similar-sized head and performed tests by hitting the dummy's head at various places— Roehler's yacht, the rescue yacht, and the dory. He found one place inside the dory where hitting the head a certain way could cause two impact marks at the same time which were like those on Douglas' head. Compared to the other expert testimony in the case, this evidence does not seem overly impressive. Moreover, Roehler does not claim that admission of this evidence rendered the trial fundamentally unfair. *Cf. McGuire*, 902 F.2d at 753–54.

adumbrate what we have seen in the record before us.

While the prosecution relied heavily upon expert testimony about the event itself, there was ample evidence regarding motive, the general health of the victims, and the swimming abilities and experiences of the victims and of Roehler himself.

Roehler's own story established the framework for the experts' experiments and testimony. He claimed that the dory accidentally overturned whereupon Douglas, Verna, a dog, and Roehler himself were dumped into the water. When he, after being trapped under the dory for a short time, was able to look about, Verna and Douglas were already drowned or in a near-drowned condition. Both were unconscious within three minutes of the capsizing event, and the only sound made by either of them after that event was air passing in and out of them as Roehler tried, he said, to administer CPR. With that introduction, we turn to the experts.

### 1. Non-Medical Testimony.

A naval architect, John L. Borg, testified that he had a great deal of experience with dories in the ocean. They are very stable and want to come upright even when they are tipped. One would not expect a dory to capsize the way Roehler indicated. Detective Fred Ray found it very difficult to turn the dory in question over and determined that it turned over very slowly even when one tried to capsize it. Moreover, it was rather easy to roll the dory upright again. Dr. Roy Hickman, a professor of mechanical engineering, also testified that an accidental overturning of this dory was a very unlikely event, given its physical characteristics. Moreover, if it were to turn over it would do so slowly. Indeed, the edge coming down would be close to zero velocity as it entered the water. Finally, Dr. Keith Friedman, an engineer, and Dr. Carley Ward, a biomechanics engineer, performed experiments and calculations. They determined that if a person were rising in the water as the dory was coming down, the speed of impact and the force generated would be relatively low.

### 2. Medical Testimony.

The prosecution's medical testimony built upon the non-medical testimony and was to the effect that it was most unlikely that any mechanism involved in the accident described by Roehler could have caused the head injuries sustained by Verna and Douglas. That is to say, the blows that Verna and Douglas, especially Douglas, suffered to their heads were not a result of the accident Roehler described. Some other agency caused them. Of course, the only other agency on the scene was Roehler, as far as can be told. The greater portion of the testimony related to the injuries to Douglas. As to those, a number of doctors testified that the injuries were severe enough to render him unconscious and simply could not have been caused by the capsizing of the dory, or by being hit against Bird Rock—a projecting rock in the area. *See* Dr. Burton Kolp (no possibility that the dory capsizing event caused the injuries and highly unlikely that thrashing about in the water did it); Dr. Randall Smith (very unlikely that the dory event caused the injury; simply not enough force); Dr. Joseph Davis (the injuries were not consistent with the capsizing event); Dr. Charles Petty (the capsizing event could not have caused the injuries, which were sufficient to render Douglas unconscious); Dr. De Witt Hunter (the injuries were not caused by the capsizing event, or Bird Rock, or hitting one's head on the dory after it capsized; the death of Douglas was not by accident, but the doctor could not say whether it was or was not a homicide).

Verna's injuries were also discussed, although they were less severe. Dr. Hunter opined that it was entirely unlikely that they were both caused by the capsizing event or by Bird Rock. Her death, in his opinion, was not caused by an accident, although he could not say if it was or was not a homicide. The injuries were severe enough to stun Verna for a period of from one second to twenty minutes, according to Dr. Ronald Kornblum, who, by the way, also thought that the injuries to both Verna

306

and Douglas were minor and probably accidental.

In sum, the expert testimony was sufficient to permit a jury to determine that Verna and Douglas did not die as a result of the accident described by Roehler, but rather as a result of a human-directed series of events. Other difficulties with Roehler's testimony tended to underscore that. He was a trained ocean diver, swimmer and rescuer. He was known to be cool under fire. Yet he, according to his story, behaved in some very unusual ways. For example, he let the floating dory drift away rather than using it to help support Douglas and Verna. He also swam 150 feet with them and against the current to a place on Bird Rock that was out of the view of others at a relatively near anchorage, rather than swimming twenty to forty feet to the edge of that rock from which point he and the victims could have been seen from the anchorage. Moreover, it appears that he suffered no injuries, even though a young dog was fighting for its life and clinging to his head and neck. In addition, while he seemed exhausted when rescued, he was back to normal rather quickly—normal breathing, normal color, etc., and did not even show any signs of leg cramps. Of course, as the prosecution argued, the medical testimony was the lynchpin of the case, for it tended to show that the deaths did not occur as Roehler claimed they did.

While there was evidence favorable to Roehler and this was by no means a clear case, the jury had an opportunity to see and hear the witnesses. The jury had the opportunity to balance the witnesses' testimony and to determine their credibility after a full discussion in which the jurors' twelve minds could interact and the jurors could debate the issues involved.

We do not have the jurors' right to weigh the evidence. *See Jackson*, 443 U.S. at 326, 99 S.Ct. at 2792–93. We understand the fallibility of human institutions and we are touched by the possibility that those institutions can malfunction and cause a terrible tragedy to become even worse through an injustice to its survivor. But

while we are called upon to approach our task with care, we must also approach it with a degree of humility and restraint. The question is not whether we are personally convinced beyond a reasonable doubt. It is whether rational jurors could reach the conclusion that these jurors reached. We determine that they could.

AFFIRMED.