Filed 2/19/14  P. v. Redmond CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E057834 |
| v. | (Super.Ct.No. FSB1100878) |
| ARIS DANIEL REDMOND, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Harold T. Wilson, Jr., Judge.  Affirmed.

William J. Capriola, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson, and Laura A. Glennon, Deputy Attorneys General, for Plaintiff and Respondent.

1

# I

# INTRODUCTION[1]

During a six-week crime spree, defendant Aris Daniel Redmond committed 12 robberies at six businesses. He testified at trial, denying culpability and blaming his cousin for the robberies.

A jury convicted defendant of 12 felony counts of second degree robbery. (§ 211, subd. (a).) The jury also found true the allegations that defendant had suffered seven prior strike convictions and two serious and/or violent felony convictions within the meaning of the Three Strikes law (§§ 667, subds. (b)-(i); 1170.12, subds. (a)-(d)). The trial court sentenced defendant to 12 consecutive 25-year-to-life third-strike terms, for a total indeterminate sentence of 300 years to life.

On appeal, defendant argues the court prejudicially erred by giving CALCRIM No. 361 [failure to explain or deny adverse testimony] and that his 300-year sentence constitutes unconstitutional cruel and unusual punishment. We reject these contentions and affirm the judgment.

# II

# STATEMENT OF FACTS

## A. THE ONTARIO CIRCLE K ROBBERY (COUNT 1)

On December 1, 2010, at 5:46 p.m., Zeeshan O'Neill was working at an Ontario Circle K store. Defendant, a Black man wearing a sweatshirt and a "do-rag" head

---

[1] All unspecified statutory references are to the Penal Code.

covering, entered the store and purchased a cigar. Defendant had a teardrop tattoo near one of his eyes. When O'Neill opened the cash register, defendant pointed a gun at O'Neill and took between $150 and $200 from two cash registers. The robbery was recorded on the store's video surveillance cameras.

## B. THE WIRELESS STORE ROBBERY (COUNTS 2-4)

Later on December 1, 2010, at approximately 6:15 p.m., Clara Cabrales and Jannet Partida were working nearby at The Wireless Store in Ontario. They noticed defendant in line, inviting people to go ahead of him. Cabrales eventually helped defendant pick out a phone case for his girlfriend and he said he would return with the money. When defendant returned, Partida was helping another customer, Marlon Tillett. When Cabrales opened the register, defendant pointed a gun at her and seized about $1,000 from the register. While still brandishing his gun, defendant told Cabrales, Partida, and Tillett to get down on the floor and he took Tillett's wallet, which contained approximately $40 in cash, his driver's license, and various credit and membership cards.

Cabrales could not pick out defendant in a six-pack lineup but she identified him at the preliminary hearing and the trial. Partida and Tillett identified defendant as the robber at trial. Tillett also identified defendant at the preliminary hearing. The robbery was recorded on videotape shown to the jury. Defendant's partial palm print was found at the scene on the glass entry door of The Wireless Store.

## C. THE CITY TALK STORE ROBBERY (COUNTS 5-7)

On December 20, 2010, at 6:45 p.m., Shih Young, the owner, and Daniel Torres, an employee, were working at the City Talk store in Montclair. Norlan Maltez was a

3

customer waiting for his cell phone to be fixed.

An African-American male, identified as defendant, entered the store, looked at some cell phone cases, and then left. Maltez described the man as being approximately 5 feet 7 to 10 inches tall and 200 pounds. He had a small teardrop facial tattoo.

When defendant reentered the store, he pointed a handgun at Young, Torres, and Maltez, ordered them to the ground, and demanded their wallets. Maltez's wallet contained his driver's license, credit cards, and approximately $40 in cash. Torres gave defendant about $60. Young gave defendant the $2 he had in his pocket. Defendant also removed about $200 from the cash register.

Maltez identified defendant at trial. Young could not identify defendant. The robbery was recorded on videotape shown to the jury.

D. THE VANS STORE ROBBERY (COUNTS 8-9)

Later on December 20, 2010, at about 7:15 p.m., Jessica Signor and Roniesha Holden were working at a Vans store in Chino. The store did not have video surveillance. Defendant entered the store and pulled out a gun. Defendant had a tattoo or scar under his eye, and was wearing a black do-rag and a white hooded sweatshirt with a black design. Defendant ordered Signor to open the store's two cash registers and removed about $1,500. Defendant ordered both women to lay down on the ground and ran out of the store. Signor could not identify defendant in the photographic lineups but she identified defendant at the preliminary hearing and at trial.

E. THE 96 CENT STORE ROBBERY (COUNTS 10-11)

Sang Nguyen (Sang) and his father, Dang, owned the 96 Cent Store on Waterman

4

in San Bernardino.  On December 22, 2010, at approximately 7:30 p.m., a heavyset Black male, identified as defendant, approached the counter to buy a Shasta Tiki Punch drink.  When Sang opened the cash register, the man pointed a gun at him and demanded money as Dang was walking by.  Defendant grabbed Dang, shoved him into a glass display case, breaking it, and hit him in the head with the gun.  Defendant grabbed about $100 from the cash register and fled the store, leaving the Shasta drink behind.

Defendant's latent fingerprints were recovered from the Shasta drink.  The robbery was recorded on videotape shown to the jury.

F.  THE SAN BERNARDINO CIRCLE K ROBBERY (COUNT 12)

On January 12, 2011, at approximately 6:30 p.m., an African-American man, identified as defendant, walked up to the cash register at the Circle K store located at Third and Waterman in San Bernardino, with a Snapple soft drink and a box of Hot Tamales candy.  He told the salesclerk, Martina Balmaceda, he did not have money with him, and that he would be right back.

A few minutes later, he turned and handed Balmaceda $5.  While she was making change, defendant jumped over the counter, bloodied Balmaceda in the mouth with a gun, and ordered her to open the cash register.  Defendant removed about $800 or $900 from the cash register and fled the store, leaving the Snapple drink and candy on the counter.

Defendant's latent fingerprints were recovered from the drink and the candy.  The robbery was recorded on videotape shown to the jury.  Balmaceda identified defendant at trial and at the preliminary hearing.  She could not identify defendant in a photographic lineup.

5

## G.  OTHER EVIDENCE

The police arrested defendant on January 13, 2011, driving a maroon Ford Taurus. Inside the vehicle, the police found an airsoft pellet gun, a black and white waffle-weave sweatshirt, and a dark-colored hooded sweatshirt.  The trunk of the vehicle contained a backpack with wallets, identifications, and credit cards belonging to two of the robbery victims, Maltez and Tillett.  The police found a black do-rag at defendant's residence.

Defendant confessed to committing the robberies of the Circle K and Wireless stores on December 1, 2010, the robberies of the City Talk and Vans stores on December 20, 2010, and the robbery of the Circle K store on January 12, 2011.

## H.  DEFENDANT'S TESTIMONY

At trial, defendant testified and denied committing any of the charged offenses. He admitted having seven prior robbery convictions and several theft-related misdemeanor convictions.  Defendant blamed the Circle K robbery in Ontario, the 96 Cent store robbery, and the Vans store robbery on his cousin, Darnell Munson, who resembles him.  Defendant claimed that the airsoft gun, clothes, and backpack found in his car belonged to his cousin.  At the time of his arrest, defendant and his cousin were sharing a room in his uncle's house.

Defendant could not confirm his claim that he was working as a personal trainer on the nights of December 1, 20, and 22, 2010.  Defendant said he had purchased a phone card at The Wireless Store in Ontario about an hour before the robbery, which was probably how his fingerprints got on the store's front door.  He denied ever having been

6

to the City Talk store in Montclair. He denied having visited the Vans store in Montclair since 2000.

Defendant and his girlfriend and two other people ate dinner at a restaurant near the 96 Cent store a day or two before the robbery. Defendant's girlfriend purchased their drinks at the 96 Cent store but he does not drink carbonated beverages and he exchanged his for a different drink.

Defendant stopped at the Circle K in San Bernardino on his way to pick up his cousin from the apartments next door but he did not have enough money to pay for the sodas and Hot Tamales so he asked the clerk to hold the items for him. Defendant picked up his cousin from the apartments and his cousin went into the Circle K to pay but ran back to the car yelling "drive, drive, drive." Later, the cousin said he had robbed the store.

Defendant admitted the robberies to the police because he wanted the police to release his pregnant fiancée, whom the police had also arrested and who was undocumented.

### III

### CALCRIM NO. 361

Defendant contends the trial court improperly instructed the jury with CALCRIM No. 361 about the failure to explain or deny evidence against him because he testified, offering explanations and denials of the evidence against him. (*People v. Saddler* (1979) 24 Cal.3d 671, 682-683; *People v. Lamer* (2003) 110 Cal.App.4th 1463, 1469.) Respondent argues that defendant waived any objection below but that the error was

7

harmless. We agree that substantial evidence linked defendant to the robberies, including identifications by the various victims, his fingerprints on the items he handled at the stores, the items recovered from his car, and his own admissions to police.

CALCRIM No. 361 provides: "If the defendant failed in his testimony to explain or deny evidence against him, and if he could reasonably be expected to have done so based on what he knew, you may consider his failure to explain or deny in evaluating that evidence. Any such failure is not enough by itself to prove guilt. The People must still prove the defendant guilty beyond a reasonable doubt. [¶] If the defendant failed to explain or deny, it is up to you to decide the meaning and importance of that failure."

It is error to instruct with CALCRIM No. 361 if a defendant does not fail to explain or disclose any facts within his knowledge that would have shed light on the crime or testifies to a version of events that contradicts the prosecution case. (*People v. Saddler, supra,* 24 Cal.3d at pp. 682-683; *People v. Marks* (1988) 45 Cal.3d 1335, 1346.) "A contradiction between the defendant's testimony and other witnesses' testimony does not constitute a failure to deny which justifies giving the instruction. [Citation.] '[T]he test for giving the instruction is not whether the defendant's testimony is believable. CALJIC No. 2.62 [CALCRIM No. 361's predecessor] is unwarranted when a defendant explains or denies matters within his or her knowledge, no matter how improbable that explanation may appear.' [Citation.]" (*People v. Lamer, supra,* 110 Cal.App.4th at p. 1469.)

Defendant offered detailed—if imaginative—explanations to account for the weight of evidence that he committed the robberies. He either blamed his cousin or

offered explanations for the incriminating evidence like his fingerprints on the glass door at The Wireless Store, the Shasta drink from the 96 Cent Store, or the Snapple drink and the Hot Tamales from the last robbery at the Circle K Store. He claimed he confessed falsely to protect his girlfriend. His excuse for the items found in his car—the gun and backpack—was also to blame his cousin. Respondent concedes it was error to charge the jury with CALCRIM No. 361 but asserts the error was harmless, applying the *Watson*[2] standard. (*People v. Saddler, supra,* 24 Cal.3d at pp. 683-684; *People v. Lamer, supra*, 110 Cal.App.4th at p. 1472; *People v. Kondor* (1988) 200 Cal.App.3d 52, 57; *People v. Roehler* (1985) 167 Cal.App.3d 353, 393.)

Some reasons the courts have found it was harmless to give CALCRIM No. 361, formerly CALJIC No. 2.62, were discussed in *People v. Ballard* (1991) 1 Cal.App.4th 752, 756:

"'CALJIC No. 2.62 does not direct the jury to draw an adverse inference. It applies only if the jury finds that the defendant failed to explain or deny evidence. It contains other portions favorable to the defense (suggesting when it would be unreasonable to draw the inference; and cautioning that the failure to deny or explain evidence does not create a presumption of guilt, or by itself warrant an inference of guilt, nor relieve the prosecution of the burden of proving every essential element of the crime beyond a reasonable doubt).' In addition, courts have noted that the fact that juries are instructed, pursuant to CALJIC No. 17.31, to 'disregard any instruction which applies to

_____

[2] *People v. Watson* (1956) 46 Cal.2d 818, 836.

9

a state of facts which you determine does not exist,' also mitigates any prejudicial effect related to the improper giving of CALJIC No. 2.62. ([*People v. *]*Saddler, supra*, 24 Cal.3d at p. 684.)" (*People v. Lamer, supra*, 110 Cal.App.4th at p. 1472.)

Furthermore, applying the *Watson* standard to the instant facts, it is not reasonably probable defendant would have received a more favorable result had the court not given CALCRIM No. 361 to the jury. The evidence against defendant was overwhelming. Ten of the 12 victims positively identified defendant in court. In the two other instances, other people in the store identified him, he was recorded on video, or his fingerprints were found at the scene. The victims' driver's licenses, defendant's clothing, and a similar gun were found in defendant's car. Finally, defendant confessed to police in detail. Accordingly, any error was harmless.

IV

CRUEL AND UNUSUAL PUNISHMENT

Defendant also contends his sentence of 300 years to life was grossly disproportionate to his crimes and violates the prohibition against cruel and unusual punishment under the federal and state Constitutions. His sentence may seem harsh but it is not constitutionally infirm.

"Whether a punishment is cruel or unusual is a question of law for the appellate court, but the underlying disputed facts must be viewed in the light most favorable to the judgment." (*People v. Martinez* (1999) 76 Cal.App.4th 489, 496.) In assessing a claim of cruel or unusual punishment, the court must "decide whether the penalty given 'is so disproportionate to the crime for which it is inflicted that it shocks the conscience and

offends fundamental notions of human dignity,' thereby violating the prohibition against cruel and unusual punishment of the Eighth Amendment of the federal Constitution or against cruel or unusual punishment of article I, section 17 of the California Constitution. [Citations.]" (*People v. Cunningham* (2001) 25 Cal.4th 926, 1042.)

The United States Supreme Court has determined that indeterminate sentences imposed under California's Three Strikes law do not violate the Eighth Amendment. (*Ewing v. California* (2003) 538 U.S. 11; *Lockyer v. Andrade* (2003) 538 U.S. 63.) It is not cruel and unusual punishment to enhance the penalty for a crime because the defendant is a recidivist as long as the ultimate punishment, all facts considered, is not disproportionate to the crime. (*People v. Jameson* (1986) 177 Cal.App.3d 658, 661-662; *Solem v. Helm* (1983) 463 U.S. 277, 284-288; *Harmelin v. Michigan* (1991) 501 U.S. 957, 997 (conc. opn. of Kennedy, J.).)

Under the California Constitution, a punishment is excessive if "it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*In re Lynch* (1972) 8 Cal.3d 410, 424, fn. omitted.) Defendant must overcome the "considerable burden" of convincing a reviewing court that his sentence was disproportionate to his level of culpability. (*People v. Weddle* (1991) 1 Cal.App.4th 1190, 1197.)

In assessing a claim that a particular sentence is cruel and unusual under the California Constitution, reviewing courts consider: (1) the nature of the offense and/or the offender, with particular regard to the degree of danger both present to society; (2) a comparison of the challenged penalty with the punishments prescribed in the same

11

jurisdiction for different offenses which, by the same test, must be deemed more serious; and (3) a comparison of the challenged penalty with the punishments prescribed for the same offense in other jurisdictions having an identical or similar constitutional provision. (*In re Lynch, supra*, 8 Cal.3d at pp. 425-427.)

As to the first *Lynch* factor, when evaluating the offense the court looks at "the totality of the circumstances surrounding the commission of the offense in the case at bar, including such factors as its motive, the way it was committed, the extent of the defendant's involvement, and the consequences of his acts." (*People v. Dillon* (1983) 34 Cal.3d 441, 479.) When evaluating the particular offender, the focus is on "individual culpability as shown by such factors as his age, prior criminality, personal characteristics, and state of mind." (*Ibid.*) This court need not reach the second and third *Lynch* factors unless a threshold comparison of the crimes committed and the sentence imposed leads to an inference of gross disproportionality. (*Harmelin v. Michigan, supra*, 501 U.S. at p. 1005.)

Defendant's crime spree continued until he was arrested; his robberies increased in severity and violence toward his victims with each subsequent robbery. During the 96 Cent Store robbery, defendant smashed the victim against a glass case, also hitting his head with the gun. While robbing the Circle K Store in San Bernardino, defendant hit Balmaceda in the mouth with the gun several times, drawing blood. His other victims were frightened and panicked from being threatened with a gun. Defendant showed no remorse.

Defendant committed the 12 robberies in addition to his seven prior robbery convictions. His crime spree began only two months after his release from prison in September 2010. The nature of defendant's crimes, as well as his extensive criminal history, made the trial court's 300-year sentence an appropriate exercise of its discretion. His sentence was not cruel and unusual, under either the state or the federal Constitution.

V

DISPOSITION

The trial court's instructional error was harmless. Defendant's punishment was constitutionally valid.

We affirm the judgment.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON

J.

We concur:


HOLLENHORST

Acting P. J.


McKINSTER

J.


13